

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-12-1996

# United States v. Stelmokas

Precedential or Non-Precedential:

Docket 95-1894

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation

"United States v. Stelmokas" (1996). *1996 Decisions.* Paper 25.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/25

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


No. 95-1894


UNITED STATES OF AMERICA

v.

JONAS STELMOKAS,
a/k/a JONAS STELMOKEVICIUS,

Appellant


On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil No. 92-03440)


Argued June 10, 1996

BEFORE:  STAPLETON, GREENBERG, and ALDISERT, Circuit Judges

(Filed:  November 12, 1996)

Eli M. Rosenbaum
Susan L. Siegal
Robert G. Seasonwein (argued)
Ronnie L. Edelman
Office of Special Investigations
United States Department of
Justice
Criminal Division
1001 G Street, N.W.
Washington, DC 20530

Attorneys for Appellee

John R. Carroll (argued)
Carroll & Carroll
400 Market Street
Suite 850
Philadelphia, PA 19106

Attorneys for Appellant

OPINION OF THE COURT

GREENBERG, Circuit Judge.

## I.  PROCEDURAL AND FACTUAL HISTORY

Defendant Jonas Stelmokas appeals from a final judgment entered August 2, 1995, in favor of the government on six counts of its seven-count complaint seeking judgment on seven discrete bases revoking Stelmokas's citizenship and ordering him to surrender his certificate of naturalization.  The court entered judgment in favor of Stelmokas on a seventh count of the complaint.

The government initiated this action on June 15, 1992, by filing the complaint against Stelmokas in the district court pursuant to section 340(a) of the Immigration and Nationality Act of 1952, as amended ("INA").  8 U.S.C. § 1451(a).  The government sought judgment revoking and setting aside the judgment of the United States District Court for the Eastern District of Pennsylvania which admitted Stelmokas to citizenship in 1955.  It further sought judgment canceling Stelmokas's certificate of naturalization.

In its complaint, the government alleged that Stelmokas was born in Moscow, Russia, and resided in Lithuania commencing in 1930.  From 1936 until 1939 Stelmokas attended the Lithuanian army officers' school in Kaunas, Lithuania, from which he graduated in 1939.  From August 1939 until July 1940 Stelmokas was an officer in the Lithuanian army.

The complaint alleged that in June 1941 the armed forces of Nazi Germany occupied Lithuania, which occupation continued until August 1944.  During the occupation, the Germans organized armed Lithuanian units known as Schutzmannschaft to assist the Germans in the occupation and in the persecution of Jews and other unarmed persons on the basis of their race, religion, national origin, or political opinion.  The Germans also organized Schutzmannschaft in other countries who arrested, detained, assaulted, and murdered victims in Poland, Ukraine, Byelorussia, and other areas.  The Lithuanian Schutzmannschaft in Kaunas assisted the Germans in confining and murdering Jews.  The government contended that Stelmokas was a voluntary member and officer of the Schutzmannschaft and advocated, assisted, participated, and acquiesced in the murder and persecution of Jews and other unarmed civilians in Lithuania.  Around August 1944, at the time the German occupation of Lithuania ended, Stelmokas entered the German Air Force (Luftwaffe) in the 91st Light Flak Replacement Unit.

The complaint further alleged that in July 1949 Stelmokas sought a determination from the United States Displaced Persons Commission ("DPC") that he was a displaced person as defined in the Displaced Persons Act of 1948 ("DPA"), Pub. L. No. 80-774, ch. 647, 62 Stat. 1009 (1948), and therefore was eligible to immigrate to the United States.  In connection with his application, a DPC analyst interviewed Stelmokas.  He did not inform the analyst that he had served in the Schutzmannschaft or the Luftwaffe.  Rather, Stelmokas falsely claimed that he had been a teacher in Seda, Lithuania, from July 1940 until August 1943.  He claimed that he then was unemployed in Kaunas until

July 1944, and was a laborer in Dresden, Germany, from 1944 until March 1945.  The complaint alleged that in 1949 the DPC regarded the Schutzmannschaft to be "inimical" to the United States, meaning it was a hostile movement.

The complaint further stated that, in reliance on Stelmokas's misrepresentations, the DPC analyst concluded that Stelmokas was eligible for displaced person status, and that the DPC so certified him on July 8, 1949.  On or about August 10, 1949, Stelmokas applied for a visa to enter the United States.  In connection with that application, Stelmokas repeated to an American vice-consul in Hamburg, Germany, the benign wartime history that he had related to the DPC analyst and omitted his actual wartime employment history.  Based on Stelmokas's false representations, the vice-consul approved Stelmokas's application for a visa.  Stelmokas then entered the United States as a displaced person and permanent resident on August 31, 1949.

The complaint asserted that on or about November 12, 1954, Stelmokas filed an application for naturalization with the Immigration and Naturalization Service.  Again, Stelmokas misrepresented under oath his personal history by claiming that the only organization to which he belonged before 1945 was the Lithuanian Boy Scouts.  Thus, he concealed his membership in the Schutzmannschaft and the Luftwaffe.  On April 11, 1955, the district court granted his petition for naturalization.

The government requested that the court revoke Stelmokas's naturalization for the following reasons:  (1) he illegally procured his naturalization because he was ineligible for a visa to enter the country as he had assisted in persecuting civilian populations (Count I); (2) he illegally procured his naturalization because he was ineligible to enter the country as he voluntarily had assisted enemy forces during World War II in their operations against the United Nations (Count II); (3) he illegally procured his naturalization because as a member of the Schutzmannschaft and the 91st Light Flak Replacement Unit he was ineligible to enter the country because he had been a member of and participated in movements hostile to the United States (Count III); (4) he illegally procured his naturalization because he had misrepresented his wartime service to the DPC and to the vice-consul and thus was ineligible to enter the country (Count IV); (5) he illegally procured his naturalization because he was ineligible for a visa as he had advocated or acquiesced in activities or conduct contrary to civilization and human decency on behalf of Axis countries during World War II and thus was ineligible to enter the country (Count V); (6) he illegally procured his naturalization as his participation in the Nazi program of persecution demonstrated that he was not of good moral character and thus he was ineligible to enter the country (Count VI); and he illegally procured his naturalization by concealing and misrepresenting material facts, i.e., his service in the Schutzmannschaft and the 91st Light Flak Battalion when he filed his petition for naturalization (Count VII).

Stelmokas filed an answer to the complaint in which he admitted the historical facts regarding the German occupation of Lithuania and admitted that he had applied for entry into the

United States as a displaced person. However, he refused to answer the allegations in the complaint regarding his wartime activities as he claimed "that his answers could be used against him in criminal proceedings in the United States and other countries." The government then moved to compel Stelmokas to answer the complaint on the ground that Stelmokas could not rely on the Fifth Amendment to refuse to answer.

On April 16, 1993, the district court granted the government's motion as it concluded that either the sections of federal law under which Stelmokas feared prosecution were inapplicable to him or the statute of limitations barred prosecutions under them. Thus, the court concluded that Stelmokas did not face a real and substantial threat of prosecution in the United States. The court also found that Stelmokas did not face a real and substantial threat of prosecution in "other countries," and thus it had no need to determine whether the Fifth Amendment applied to foreign prosecutions. The court, however, protected Stelmokas by ordering that his answer be filed under seal. Stelmokas never complied with the order and did not file an amended answer. Furthermore, at a deposition on August 4, 1993, Stelmokas pleaded the Fifth Amendment and refused to answer questions germane to this case.

The court conducted a bench trial from February 27, 1995, until March 3, 1995. At the outset of the trial Stelmokas's attorney pointed out that Stelmokas had pleaded the Fifth Amendment. He then indicated that he wanted to keep his options open and that he did not know what he would advise Stelmokas to do. He said that Stelmokas "may waive the privilege." Stelmokas, however, did not waive the privilege and did not testify at the trial.

The district court decided the case in a comprehensive memorandum opinion dated August 2, 1995. In its opinion the court set forth the background of Stelmokas's application to come to the United States and his obtaining citizenship. The court noted that citizenship is a precious right which once conferred may not be revoked lightly. Consequently, the government in a denaturalization proceeding must prove its case by clear, unequivocal, and convincing evidence so as not to leave the issue, i.e., the basis for denaturalization, in doubt. Kungys v. United States, 485 U.S. 759, 772, 108 S.Ct. 1537, 1547 (1988); Fedorenko v. United States, 449 U.S. 490, 505, 101 S.Ct. 737, 747 (1981). The court noted, however, that aliens have no right to naturalization unless all statutory requirements are complied with. Consequently, every certificate of citizenship is granted on the condition that the government may revoke it if it was not issued in accordance with the applicable requirements. Fedorenko, 449 U.S. at 506, 101 S.Ct. at 747.

The court pointed out that section 340(a) of the INA provides the statutory bases for revocation of citizenship: that the citizenship had been "illegally procured" or "procured by concealment of a material fact or by willful misrepresentation." 8 U.S.C. § 1451(a). The court then indicated that citizenship is "illegally procured" when obtained without compliance with the

statutory requirements for naturalization.  Fedorenko, 449 U.S. at 506, 101 S.Ct. at 747.  When Stelmokas was naturalized in 1955, the INA required that he reside continuously in the country for at least five years after being lawfully admitted for permanent residence.  8 U.S.C. § 1427.  See United States v. Osidach, 513 F. Supp. 51, 63 & n.4 (E.D. Pa. 1981).

The court then observed that the DPA authorized the issuance of immigration visas to eligible European "displaced persons" without regard to immigration quotas, but that persons who "assisted the enemy in persecuting the civilian populations" of countries that were members of the United Nations or voluntarily assisted the enemy forces since the outbreak of World War II in their operations against the United Nations were not displaced persons.  DPA § 2(b), 62 Stat. 1009, 3051–52 (incorporating by reference International Refugee Organization Constitution's definition of displaced person).  See Fedorenko, 449 U.S. at 495 & n.3, 101 S.Ct. at 741 & n.3.  Additionally, DPA § 13 prohibited the issuance of visas to "any person who is or has been a member of, or participated in, any movement which is or has been hostile to the United States or the form of government of the United States."  62 Stat. 1014.  Section 10 of the DPA provided that any "person who shall willfully make a misrepresentation for the purpose of gaining admission into the United States as an eligible displaced person shall thereafter not be admissible into the United States."  62 Stat. 1013.

The court further noted that at the time of Stelmokas's immigration in 1949, a State Department regulation forbid the issuance of a visa to any alien who had "advocated or acquiesced in activities or conduct contrary to civilization and human decency on behalf of the Axis countries" during World War II.  The court also indicated that when Stelmokas was naturalized in 1955, the law provided that citizenship could be conferred only on persons "of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States."  8 U.S.C. § 1427(a)(3).  Finally, the court pointed out that the INA provided that citizenship procured by willful concealment or misrepresentation of a material fact must be revoked.  8 U.S.C. § 1451.

The district court made an evidentiary ruling in its opinion that Stelmokas challenges on this appeal.  It noted that Stelmokas had pleaded the Fifth Amendment in his answer and had refused on Fifth Amendment grounds to answer questions at his deposition.  Furthermore, Stelmokas had not testified at trial.  The court held that Stelmokas's attorney's statement at the outset of the trial that Stelmokas "may waive the privilege" was not a waiver of the privilege against self-incrimination, but was the opposite, since it was not a statement that the privilege was waived.  The court then held that since the case was civil rather than criminal it, as the finder of fact, could infer from Stelmokas's invocation of the privilege against self-incrimination that his testimony would have been unfavorable.  See Baxter v. Palmigiano, 425 U.S. 308, 318, 96 S.Ct. 1551, 1558 (1976).  The court indicated, however, that while it could draw

adverse inferences from Stelmokas's claim of the privilege against self-incrimination, it would not base its findings of fact on adverse inferences. Rather, the court would use Stelmokas's invocation of the Fifth Amendment for "independent and additional support" for its findings of fact.

In its findings of fact, the court preliminarily noted that the government had called four witnesses, two experts on the Holocaust, Dr. Raul Hilberg and Michael MacQueen, and two survivors of the Holocaust in Lithuania, David Levine and Abe Malnick. In addition, the government introduced numerous documents into evidence. Stelmokas did not call any witnesses but did introduce three documents into evidence. The court pointed out that Hilberg was a particularly credible witness with a remarkable knowledge of the documents placed into evidence.

The court noted that many of the documents in evidence had been stored in the archives of the former Soviet Union. While Stelmokas argued that the documents were not trustworthy, the court rejected this contention because Hilberg's and MacQueen's testimony established that they were authentic. Indeed, Hilberg testified that he was not aware of a single World War II Soviet Union archival document that was a forgery. The court concluded that the government "amply established the authenticity and trustworthiness of the documents in evidence."

The court then related Stelmokas's personal history prior to the German invasion, including his graduation from military academy and his service as an officer in the Lithuanian Army and the Soviet Red Army when the Soviet Union annexed Lithuania in 1940. The court explained that the Germans took over Lithuania within a few days of their attack on June 22, 1941, and that the German army was followed by a police unit known as Einsatzgruppen, which implemented the German policy of murdering the Jews. The court related that a segment of the indigenous Lithuanian population cooperated with the Einsatzgruppen in the murder of the Jews.

Starting in late June 1941, the Germans began organizing Lithuanians who had fought against the Soviet Union into volunteer police battalions. The Germans controlled these units, which became known as the Schutzmannschaft. Their function was to guard installations and prisoners, and they guarded the Kaunas ghetto. The Schutzmannschaft assisted in the murder of Jews and other persons.

The court found that on July 28, 1941, Stelmokas voluntarily enlisted in the Schutzmannschaft and was appointed platoon commander in the 7th Company. The court traced Stelmokas's various assignments in the Schutzmannschaft, a process made possible by the meticulous record keeping of the Schutzmannschaft units, which court opinions demonstrate was consistent with the Germans' practice during World War II of recording their murderous conduct in specific detail. See, e.g., United States v. Koziy, 540 F. Supp. 25, 27 (S.D. Fla. 1982), aff'd, 728 F.2d 1314 (11th Cir.), cert. denied, 469 U.S. 835, 105 S.Ct. 130 (1984). By August 30, 1944, Stelmokas had been transferred to Germany where he served in the 91st Light Flak Replacement Unit of the Luftwaffe. The records in evidence show

that Stelmokas was in a military hospital in Germany on February 12, 1945.

The court found that on September 15, 1941, Stelmokas was a guard commander at Vilijampole, which was the ghetto in Kaunas. The evidence showed clearly, unequivocally, and convincingly, that Stelmokas served as the commander of the ghetto guard for at least a 24-hour period commencing on September 16, 1941, at 1:00 P.M., and, accordingly, that he participated in confining the Jews to an area in which they were regularly subjected to extreme deprivation, brutality, and arbitrary shootings. The court then found, through a painstaking analysis of the Schutzmannschaft records, that Stelmokas's battalion took part in the Grosse Aktion of October 28 and October 29, 1941, which involved the murder of precisely 9,200 Jews, and that Stelmokas was on duty at that time. Levine and Malnik, who were children in the ghetto at the time, supported the documentary evidence with eye-witness testimony. While Levine and Malnick did not identify Stelmokas, both testified that armed Lithuanians took part in the murders. The court also made findings that Stelmokas participated in anti-partisan actions and served in the Luftwaffe.

The court found that when Stelmokas applied for displaced person status he did not inform the DPC analyst of his Schutzmannschaft and Luftwaffe service, and that he misrepresented his employment and places of residence for the period of July 1940 until March 1945. The court also noted that the Lithuanian Schutzmannschaft appeared on a "List of Organizations Considered Inimical to the United States" issued by the DPC Headquarters in Frankfurt, Germany. The court found that Stelmokas made false statements under oath when he sought his visa application, because he misrepresented his wartime residences and did not reveal his Schutzmannschaft or Luftwaffeservice. The court found that he obtained his visa because of the misrepresentation. The court did not find, however, that Stelmokas made false statements when he was naturalized.

The court then discussed the adverse inferences to be drawn from Stelmokas's claim of the privilege against self-incrimination. It emphasized, however, that the findings of fact we have described did not depend on the drawing of inferences from Stelmokas's claim of the privilege. The court said that it inferred that Stelmokas's testimony would have revealed that he voluntarily joined the Schutzmannschaft and served in it from July 1941 until mid-1944, when he was transferred to Germany to serve in the 91st Light Flak Battalion; he was commander of the ghetto guard at Kaunsas in September 1941; he participated in the murdering of Jews in the Grosse Aktion and in fighting against anti-German partisans; and he made false representations to both the DPC analyst and the vice-consul regarding his wartime activities, particularly his service in the Schutzmannschaft and the Luftwaffe, to facilitate his immigration to the United States.

The court then set forth its conclusions of law. It reiterated that the government had to prove its case by clear, unequivocal, and convincing evidence, but that under 8 U.S.C. §

1451(a) Stelmokas's certificate of naturalization must be canceled and his citizenship revoked if his citizenship was "illegally procured" or "procured by concealment of a material fact or by willful misrepresentation." It also pointed out that Stelmokas could not have procured his citizenship lawfully in 1955 if his admission to permanent residence in 1949 had not been lawful. 8 U.S.C. § 1427; Fedorenko, 449 U.S. at 514-16, 101 S.Ct. at 750-52.

The court held that under the DPA § 2(b), 62 Stat. 1009, Stelmokas had been ineligible to immigrate to the United States because his actions in the Kaunas ghetto assisted the enemy in persecuting civilian populations. Consequently, Stelmokas's entry into the United States as a permanent resident was unlawful and he had procured his citizenship unlawfully. SeeFedorenko, 449 U.S. at 512, 101 S.Ct. at 750 ("an individual's service as a concentration camp armed guard -- whether voluntary or involuntary -- made him ineligible for a visa"). The court then held that Stelmokas also had been ineligible for a visa because he voluntarily had assisted enemy forces during World War II. See United States v. Kowalchuk, 773 F.2d 488, 496-97 (3d Cir. 1985) (in banc), cert. denied, 475 U.S. 1012, 106 S.Ct. 1188 (1986). Thus, for this additional reason, his entry as a permanent resident was unlawful and he had procured his citizenship unlawfully. The court next held that the Schutzmannschaft was a movement hostile to the United States, so that Stelmokas was barred from entering the United States because of his membership in it under DPA § 13, 62 Stat. 1014. Consequently, he had procured his citizenship illegally.

The court held that DPA § 10, 62 Stat. 1013, barred Stelmokas from entering the country for permanent residence because he willfully had misrepresented material facts to gain admission. In particular, he concealed his Schutzmannschaft and Luftwaffe service from the DPC analyst and the vice-consul. These concealments were material because they misrepresented the facts that he had assisted the enemy in the persecution of civilians, voluntarily assisted the Axis powers in their military operations, and had been a member of a movement hostile to the United States and its form of government. The court found that these misrepresentations would have a natural tendency to influence the DPC and the vice-consul in making their decisions to classify Stelmokas as a displaced person and to admit him to the United States. Consequently, Stelmokas's entry into the United States as a permanent resident was unlawful so he had procured his citizenship unlawfully. See United States v. Kowalchuk, 773 F.2d at 493.

The court next held that Stelmokas had procured his citizenship unlawfully because he was not entitled to a visa to enter the country as a permanent resident as he had advocated or acquiesced in activities or conduct contrary to civilization and human decency on behalf of the Axis countries contrary to the regulations then in effect. The court also held that he did not qualify for naturalization because he lacked good moral character when he was naturalized, so that he had procured his citizenship unlawfully. 8 U.S.C. § 1427(a)(3); 8 U.S.C. § 1101(f). The

court held that Stelmokas lacked good moral character because he voluntarily joined the Schutzmannschaft, enforced the confinement of the Jews in the brutal conditions of the Kaunas ghetto, and was on duty when his battalion assisted in the Gross Aktion.

The court held that the government had not established its case in only one respect. Under the INA, procuring citizenship "by concealment of a material fact or by willful misrepresentation" is grounds for denaturalization. 8 U.S.C. § 1451(a). The court held, however, that concealment must be made in order to obtain naturalization for that charge to apply, as distinguished from concealment made to obtain a visa. Accordingly, the court held that the misrepresentations to the DPC analyst and to the vice-consul could not apply to the concealment count with respect to procuring citizenship. The court therefore held that the concealment count failed because the government did not establish that Stelmokas's statements in connection with his naturalization willfully concealed facts or included material misrepresentations of fact.

The court ended its opinion by reiterating that Stelmokas's citizenship could be revoked only on the basis of clear, unequivocal, and convincing evidence. Consequently, the government had a heavy burden in the case. The court then emphasized that there was no doubt but that Stelmokas voluntarily joined the Schutzmannschaft in 1941 and served in it until mid-1944, when he was transferred to a Luftwaffe unit in Germany. The court noted that he was the commander of the ghetto guard and was on duty in Kaunas during the Gross Aktion, when his battalion assisted in the massacre of 9,200 Jews. Furthermore, the court stated that there was no doubt that he fought anti-German partisans later in the war, and that he willfully misrepresented his wartime activities when he applied for admission to this country. For all these reasons, the court revoked his citizenship. Stelmokas then appealed.

## II.  DISCUSSION

Stelmokas raises four issues on this appeal. He contends that: (1) the district court erred in drawing adverse inferences based on his Fifth Amendment plea; (2) the district court erred in admitting as ancient documents records made during the German occupation of Lithuania and certain other wartime documents; (3) the government failed to establish its case by clear, unequivocal and convincing evidence so as not to leave its allegations regarding his wartime activities in doubt; and (4) his alleged misrepresentations regarding his wartime employment and residence were not shown to be material. We will discuss these contentions in the order presented.


### A.  The privilege against self-incrimination

We are perplexed by aspects of Stelmokas's Fifth Amendment argument. He initially contends that the district court erred when it held that he did not face a real and substantial threat of domestic and foreign prosecution. Yet we

do not understand how the alleged error prejudiced him because the district court, though overruling his plea of the privilege against self-incrimination, did not sanction him for persisting with that plea. The court did not strike Stelmokas's answer, deem the allegations of the complaint admitted, enter a default judgment against him, preclude him from presenting witnesses including even himself, or hold him in contempt. See S.E.C. v. Graystone Nash, Inc., 25 F.3d 187, 189-91 (3d Cir. 1994).

Quite to the contrary, the district court merely drew inferences against Stelmokas with respect to what his testimony would have revealed had he testified. Of course, as we shall demonstrate, the court could have drawn these inferences even if it had upheld Stelmokas's claim of the privilege against self-incrimination. Thus, while the court overruled Stelmokas's plea of the Fifth Amendment, its ruling had no consequence because the court acted as if it had upheld the plea. It thus appears that to the extent the parties' briefs address whether the court correctly overruled the claim of the privilege against self-incrimination, they focus on a non-issue. Therefore, we will not consider whether the court correctly held that Stelmokas could not plead the privilege against self-incrimination.

Stelmokas argues, however, that the court was not justified in drawing inferences against him for two reasons. First, he suggests that, in view of his attorney's statement at trial that Stelmokas "may" waive the privilege, it is not clear that he, indeed, did claim the privilege. Second, he argues that "no penalty may be imposed on a witness asserting the privilege" against self-incrimination. Br. at 19.

We reject both of these contentions. First, the court was justified in treating the case as though Stelmokas never retreated from his claim of the privilege against self-incrimination. Indeed, it hardly could have done otherwise. After all, Stelmokas claimed the privilege in his answer and at his deposition and he never filed an amended answer as the court ordered, or indicate that he would make himself available to complete his deposition by answering all the questions asked. Rather, his attorney merely said at the trial that he "may" waive the privilege, which he never did.

In S.E.C. v. Graystone Nash, Inc., we pointed out that "because the privilege [against self-incrimination] may be initially invoked and later waived at a time when an adverse party can no longer secure the benefits of discovery, the potential for exploitation is apparent [because abuse may cause] unfair prejudice to the opposing litigant." 25 F.3d at 190. At the very least, therefore, if a party initially claims the privilege against self-incrimination and then intends to waive it, he should do so clearly. If Stelmokas had waived the privilege clearly at the outset of the trial, the government could have asked for an opportunity to take a meaningful deposition. Stelmokas's maneuvering precluded that possibility. Indeed, Stelmokas's attorney at the trial, without apparent recognition of the significance of his statement, essentially admitted that he was abusing the claim of the privilege by indicating that he was keeping his options open and that he did

not know what he would advise Stelmokas to do.  We will not reward such manipulation.  Rather, Stelmokas must bear its consequences.

Second, Stelmokas's argument that he cannot be penalized for claiming the privilege relies on such cases as Lefkowitz v. Cunningham, 431 U.S. 801, 97 S.Ct. 2132 (1977), and Garrity v. New Jersey, 385 U.S. 493, 87 S.Ct. 616 (1967).  But those cases dealt with the imposition of a substantial penalty for the exercise of the privilege against self-incrimination, e.g., the loss of public office.  As we have pointed out, in this case the court did not impose any sanction on Stelmokas because of his refusal to answer questions.

Thus, this case is controlled by the principles set forth in Baxter v. Palmigiano, 425 U.S. 308, 96 S.Ct. 1551 (1976).  There, a prisoner at a disciplinary hearing was advised that he had a right to remain silent but that, if he did so, his silence would be held against him.  He remained silent and his silence was given evidentiary value against him.  The Supreme Court held that the use of his silence in this manner was proper. It distinguished the line of cases, including Lefkowitz and Garrity, that did not allow the imposition of a penalty for pleading the privilege because those cases involved the loss of employment or the opportunity to contract with the state for exercising Fifth Amendment rights.  Id. at 316-17, 96 S.Ct. at 1557.  The Court also distinguished Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229 (1965), which held that in a criminalcase a jury could not be instructed that it could draw an inference of guilt from the defendant's failure to testify. Baxter, 425 U.S. at 317, 96 S.Ct. at 1557.

The Supreme Court in Baxter held that the case was controlled by the principle that, in civil cases, "the Fifth Amendment does not forbid adverse inferences against parties . . . when they refuse to testify in response to probative evidence offered against them."  Id. at 318, 96 S.Ct. at 1558.  Thus, as long as there was independent evidence to support the negative inferences beyond the invocation of the privilege against self-incrimination, the inferences could be drawn.  See also United States v. Local 560 of the Int'l Bhd. of Teamsters, etc., 780 F.2d 267, 292 n.32 (3d Cir. 1985), cert. denied, 476 U.S. 1140, 106 S.Ct. 2247 (1986).  In this case, there was a plethora of independent evidence to support the inferences that the district court drew based on Stelmokas's claim of the privilege, so the court was justified in drawing the inferences it did.

We recognize that even though this is a civil case, seeUnited States v. Osidach, 513 F. Supp. 51, 57 (E.D. Pa. 1981), it may have drastic consequences for Stelmokas.  After all, at oral argument the attorneys told us that an affirmance probably will lead to his deportation.  But the severity of the consequences do not alter the legal determination of whether the court may draw inferences against a person pleading the privilege against self-incrimination.  Baxter itself was a disciplinary case and had penal overtones.  We also note that the Supreme Court recently has adhered to the sharp distinction between proceedings which, though possessing what might be regarded as a punitive impact,

are civil, and traditional criminal proceedings.  Thus, in United States v. Ursery, 116 S.Ct. 2135, 2138 (1996), the Court held that civil forfeitures in general do not constitute punishment for purposes of the Double Jeopardy Clause.  Accordingly, the Court would not regard a civil forfeiture action as a criminal proceeding, even though the proceeding resulted in an owner losing his property.  This case cannot be regarded as more punitive than Ursery.  In sum, a case is either civil or criminal and in the present context this case is civil.

We make one final point on the self-incrimination argument.  In this case, there was a bench trial.  Thus, unlike a jury trial in which a jury will return a general verdict or answer specific interrogatories, the district court had an opportunity to explain the bases in the evidence for its factual findings.  It did so by making it crystal clear that, even if it had not drawn any inferences from Stelmokas's claim of the privilege, it would have made the same factual findings.  Accordingly, even if the district court erred in drawing the inferences, its error would have been harmless for, as we explain below, the evidence without the inferences supported the court's findings.


### B.  The ancient documents

Stelmokas argues that the district court erred by admitting into evidence occupation documents obtained from Lithuanian archives and other sources as ancient documents pursuant to Fed. R. Evid. 803(16) which, as an exception to the hearsay rule, allows the admission of "[s]tatements in a document in existence twenty years or more the authenticity of which is established."  The challenged documents demonstrated Stelmokas's employment and activities during World War II.  In particular, Stelmokas argues that these documents "lack any assurance of trustworthiness."  Br. at 22.

Stelmokas focuses his objection on two groups of documents, principally those recovered from the records of the Lithuanian Schutzmannschaft that were located at Vilnius, the Lithuanian capital, and secondarily those recovered from German records found at other locations.  While Stelmokas recognizes that Germans or Lithuanians purportedly wrote the Schutzmannschaft documents, he observes that the Vilnius documents were kept from public inspection by the Soviet Union until 1990.  Though he also acknowledges that the government did not have to demonstrate a strict chain of custody for the documents to be admitted, in his view the documents cannot be treated as authentic because it is unclear how they were moved to the Vilnius archives.  Thus, he argues that the documents were not found in a place where, if authentic, they "would likely be" as set forth in Fed. R. Evid. 901(b)(8).

Stelmokas further argues that the documents are suspicious because the Germans destroyed many documents demonstrating their criminal conduct, but "preserve[d] evidence of Lithuanian misconduct."  Br. at 27.  Furthermore, he regards the documents as questionable because they came from Soviet

sources, and he claims that it was Soviet policy to discredit the Baltic states. Id. Finally, he argues, though with less particularly, that the government did not establish the chain of custody and authenticity of the second group of documents, i.e., those from German sources.

We review the district court's ruling that admitted the evidence over a challenge to its authenticity under an abuse of discretion standard. See United States v. McGlory, 968 F.2d 309, 328 (3d Cir.), cert. denied, 506 U.S. 956, 113 S.Ct. 415 (1992). Federal Rule of Evidence 901(a) provides that the requirement of "authentication . . . as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Rule 901(a) is written, of course, in general terms, but is followed by Rule 901(b) which includes examples of methods by which to authenticate evidence. Rule 901(b)(8) provides that authentication of an ancient document may be supplied by a demonstration that a document is in such condition as to create no suspicion concerning its authenticity, was in a place where, if authentic, it likely would be, and has been in existence 20 years or more at the time it is offered. Ancient documents are admissible into evidence as an exception to the hearsay rule. See United States v. Goichman, 547 F.2d 778, 784 (3d Cir. 1976).

We cannot say that the district court abused its discretion in admitting the documents in question. Initially, we observe that Stelmokas's argument in part is self-defeating because his contention that the Germans destroyed documents demonstrating their own criminal conduct, but preserved documents incriminating the Lithuanians, supports rather than undermines the district court's conclusions that the documents incriminating him were legitimate. Furthermore, the documents were certified by competent Lithuanian archival personnel. Hilberg, who has testified in many cases regarding eastern European Holocaust records and whose expertise cannot be doubted, testified that the documents he examined were authentic and that the documents found in Soviet possession are as reliable as documents from western countries. He said that he found the documents to be reliable and not to be forgeries. He also testified that one would expect to find documents relating to the Lithuanian Schutzmannschaft in Vilnius, the Lithuanian capital.

MacQueen testified that he personally searched archives in Lithuania and that the documents he found were authentic and reliable. In particular, he had found Schutzmannschaft records implicating Stelmokas in Vilnius, which is where they were likely to be found. Stelmokas simply has not produced any evidence or forwarded any reason to impeach the validity of the documents. See Sokaogon Chippewa Community v. Exxon Corp., 805 F. Supp. 680, 711 n.34 (E.D. Wis. 1992), aff'd, 2 F.3d 219 (7th Cir. 1993), cert. denied, 114 S.Ct. 1304 (1994).

We also point out that German records demonstrate that while Stelmokas was in the Luftwaffe, he was hospitalized in Germany. We cannot conceive that any rational person would believe that someone set out to incriminate Stelmokas and planted fake documents in widely-scattered places for that purpose. If

anyone created the documents to injure Stelmokas, the fabricator most peculiarly placed the bulk of the documents in a location where they were not accessible to the public and from which, in fact, they were not released for decades. There certainly is no evidence in the record that anyone hatched such a bizarre plot. Indeed, Stelmokas does not explain what motivation any person would have had to fabricate documents so as to attribute responsibility to him for the atrocities in Lithuania or how that could have been accomplished. Stelmokas was hardly a prominent figure in the war and it is difficult to conceive why someone would go to the lengths he suggests in order to frame him. Stelmokas's attack on the authenticity of the documents is not substantial.

### C. Sufficiency of the evidence

Stelmokas next argues that the government failed to establish its case by clear, unequivocal, and convincing evidence so as to leave no doubt as to its allegations regarding Stelmokas's wartime activities. In considering this allegation, we determine whether the district court's findings are clearly erroneous. Oberti v. Board of Ed., 995 F.2d 1204, 1220 (3d Cir. 1993). Of course, they will not be clearly erroneous if supported by clear, unequivocal, and convincing evidence.

We have reviewed the record and have concluded that the district court's findings are not clearly erroneous, as the evidence in the record fully supports them. The ultimate factual issue for resolution in this case was whether Stelmokas resided in the United States for five years "after being lawfully admitted for permanent residence." 8 U.S.C. § 1427. If he was not lawfully admitted, he was not eligible for citizenship. Resolution of this issue in turn depends on whether the district court's findings that Stelmokas should have been barred for six different reasons from entering the country were clearly erroneous as to all six. We thus emphasize that even if we upheld the findings on only one of the six bases, we would affirm.

In fact, the government demonstrated beyond all doubt that Stelmokas was not lawfully admitted for permanent residence for all six reasons. The evidence against Stelmokas was overwhelming, even without the inferences the court drew from Stelmokas's Fifth Amendment plea and, as Stelmokas called no witnesses, the evidence was not rebutted. In the circumstances, we would serve no useful purpose in detailing all the evidence to support each of the charges against him.

We highlight two examples of how Stelmokas argues his case. He contends that there is no proof that he joined the Schutzmannschaft voluntarily. While it is true that no person testified that he recalled seeing Stelmokas sign up for the Schutzmannschaft, his contention that there is no proof that he joined voluntarily ignores the record. The evidence shows that when Stelmokas joined the Schutzmannschaft, service of all its officers was voluntary as there was an ample supply of candidates and conscription was not necessary. Indeed, for at least several

months after Stelmokas joined the Schutzmannschaft, its members could be released at their own request.  Obviously, if the evidence demonstrated that service of all Schutzmannschaftofficers was voluntary, then a finding that a particular officer served voluntarily is supported in the record.  We also point out that in addition to this positive proof that Stelmokas joined the Schutzmannschaft voluntarily, the court drew the entirely justified inference from Stelmokas's claim of the privilege against self-incrimination that he joined voluntarily.

Another example of the weakness of Stelmokas's factual arguments is his claim that he did not misrepresent his wartime employment by concealing his membership in the Schutzmannschaft.  This contention is frivolous, for he acknowledges that he represented to the DPC analyst and the vice-consul that from 1940 until 1943 he was a teacher in Seda.  It is difficult to understand how Stelmokas can argue that he did not misrepresent his status as a Schutzmannschaft officer when he represented that he was a teacher for most of the time that he was in reality such an officer.

Stelmokas, however, takes a different approach to what constitutes a misrepresentation.  In a post-argument brief that he filed at our direction, he recites that "[a] relevant concealment would have occurred if the government had produced evidence that Stelmokas was asked if he had been a member of the Schutzmannschaft and said no."  Br. at 3.  Thus, Stelmokas would require that the examiner have a reason to ask about a specific narrowly defined matter.  We reject his approach.  In our view, if you falsely represent that your employment is one thing when your actual employment is completely different, then you have concealed your true employment.  In these circumstances, it is perfectly clear that Stelmokas himself demonstrates that he made a material misrepresentation when he sought displaced person status and a visa.  Surely the misrepresentation that Stelmokas was a teacher was material because it hid his true employment as a Schutzmannschaft officer.

Notwithstanding Stelmokas's failure to mount a substantial attack on the court's findings, we focus on two aspects of the government's case:  Stelmokas's participation in the Schutzmannshaft as a movement hostile to the United States and his false statements to the DPC analyst and to the vice-consul.  As we indicated, section 13 of the DPA prohibited issuance of a visa to any person "who is or has been a member of, or participated in, any movement which is or has been hostile to the United States or the form of government of the United States."  62 Stat. 1014.  It is beyond doubt that Stelmokas was an officer in the Schutzmannschaft.  It is also clear that the Lithuanian Schutzmannschaft was on the State Department "List of Organizations Considered Inimical to the United States."  The inimical list states that members of the Schutzmannschaft "are considered collaborators except for those members . . . who can produce evidence that they were conscripted and did not commit atrocities or otherwise persecute civilian populations."  Seeexhibit 4.242, app. 1672.

Stelmokas did not produce any such evidence.  Indeed,

except for a small number of exhibits, he did not produce any evidence at all. It is clear that Stelmokas voluntarily joined the Schutzmannschaft and, while there is no eye-witness testimony identifying him as a person who committed atrocities or otherwise persecuted the civilian population, the only reasonable inference to be drawn from the record is that he did exactly that. In any event, with or without the reasonable inferences to be drawn from the record, Stelmokas's service as an officer in the Schutzmannschaft disqualified him from obtaining displaced person status and a visa, as the Schutzmannschaft was a movement hostile to the United States. See United States v. Kowalchuk, 773 F.2d at 497 n.11; United States v. Koziy, 540 F. Supp. at 34; United States v. Osidach, 513 F. Supp. at 78-79.

In his post-argument brief, Stelmokas makes disturbing contentions with respect to the inimical list. He indicates that "there is no evidence of record as to what, if any [inimical] list, was in use in July and August of 1949 when [he] made his applications to the [DPC] and the consulate." He then adds that the "government has placed the so-called inimical list in evidence but it is undated and there is no testimony as to when it was published and whether the Lithuanian Schutzmannschaft was on the list as early as the summer of 1949, and if so, what effect it might have had, if any, on the decision of the DPC examiner or vice consul." Br. at 22.

While we agree that there was no testimony at trial as to what effect the presence of the Schutzmannschaft on the inimical list might have had on the decisions of the examiner or the vice-consul, we regard the balance of the quoted statements in Stelmokas's brief as material misrepresentations. Near the end of the trial, after the government's witnesses had testified and shortly before the government rested, the following proceedings took place:

THE COURT: Fine. What remains to be done today?

MS. SLAVIN [the government attorney]: Well, we would like to move Exhibit 4.242, which is the inimical list, into evidence. We have reached a stipulation.

THE COURT: Let me...

(Pause in proceedings.)

THE COURT: Okay. It was not received yesterday. Is it being received --

MS. SLAVIN: We are moving it in --

THE COURT: -- in evidence by agreement or is there a stipulation that you want to read into the record?

MS. SLAVIN: The stipulation we have

arrived at that was -- that the list was in effect during the relevant period of Mr. Stelmokas' immigration in 1949.

MR. CARROLL [Stelmokas's attorney]: And I'm withdrawing my objection to that exhibit, your Honor, for that reason.

THE COURT: Exhibit 4.242 will be received in evidence.

(Government Exhibit 4.242 is admitted into evidence.)

In the circumstances, it obviously is disingenuous for Stelmokas's attorney on this appeal, who was trial counsel as well, to challenge the use of the inimical list on the theory that the evidence did not show it was in effect when Stelmokas sought displaced person status and a visa. Of course, Exhibit 4.242 included the Lithuanian Schutzmannschaft on the list.

In any event, it would not matter if the Schutzmannschaft was added to the inimical list after Stelmokas obtained displaced person status and a visa and entered the country. Stelmokas was barred from entering the country because he was a member of the Schutzmannschaft, which was a movement hostile to the United States. The date that the Schutzmannschaftwas placed on the inimical list is not significant for purposes of determining if it was a movement hostile to the United States because its placement on the list established that it was such a movement during World War II when Stelmokas was one of its officers. The inimical list did not operate prospectively so that a movement would be regarded as hostile to the United States only after it was placed on the list. After all, the list enumerated movements that existed during the Nazi era which ended before the list's promulgation. Therefore, Stelmokas was unlawfully admitted to the United States because, regardless of when the Schutzmannschaft first appeared on the inimical list, when Stelmokas served as a Schutzmannschaft officer it was a movement hostile to the United States.

The second aspect of the evidence on which we comment is Stelmokas' misrepresentations to the DPC analyst and the American vice-consul in Hamburg. Neither the analyst nor the vice-consul testified, but it is beyond dispute that when they interviewed Stelmokas he told them nothing about his Schutzmannschaft and Luftwaffe service. Rather, he told them that during the war he was a teacher in Seda, Lithuania, and was then a laborer in Dresden, Germany. There simply can be no doubt but that the district court's findings demonstrate that Stelmokas was not eligible to immigrate to the United States.


D. The materiality of Stelmokas's misrepresentation

Stelmokas's final argument is that the government did not establish that his misrepresentations regarding his wartime

employment and residence were material.  He contends that the "government has usually attempted [to establish] proof of materiality in these cases by calling consular or INS officials to testify that their decisions would have been different if they had known the truth."  Br. at 48.  See, e.g., United States v. Kowalchuk, 773 F.2d at 496.  He then correctly points out that the government did not present any such evidence in this case.

Stelmokas's claim for relief on this basis faces the insurmountable barrier that even if he is correct, we still must affirm.  The district court found for six different reasons, all fully supported by evidence in the record, that Stelmokas was ineligible for displaced person status and for a visa and thus that he had not entered the United States lawfully and had not been eligible for citizenship.  Five of these reasons were predicated on his conduct and associations during World War II, and only one was based on his misrepresentations to the DPC analyst and the vice-consul.  Thus, even if Stelmokas had made no misrepresentations to the DPC analyst or the vice-consul, we would affirm because he procured his citizenship illegally as he was not eligible for displaced person status and for a visa.

We recognize that a party might contend that if a court of appeals rejected any of the bases for a district court's conclusion that a defendant should be denaturalized, it should remand the case so that the district court then could consider whether to grant relief predicated on the findings the court of appeals has upheld.  In that event, a finding that a defendant had not made material misrepresentations in connection with his visa application could be significant.  The problem with such an argument is that the courts do not have equitable discretion to deny the government a judgment of denaturalization to which it otherwise would be entitled.  Fedorenko, 449 U.S. at 517-18, 101 S.Ct. at 752-53.  Thus, even if we held that Stelmokas's misrepresentations were not material and, indeed, even if he made no representations at all to obtain the visa, his appeal is doomed, as he was not eligible for a visa, and we must uphold the district court even if we sustain only one of the bases for its conclusion that he had been ineligible to enter the United States.  Of course, we are sustaining the district court's conclusions on all six counts that Stelmokas was ineligible to enter the United States.  Nevertheless, we will address the materiality argument on its merits, as it does relate to one of the bases for relief.

Initially, on this appeal Stelmokas and the government agreed that Kungys v. United States, 485 U.S. 759, 108 S.Ct. 1537 (1988), set the standard for materiality in this case, even though that case concerned materiality in citizenship applications under the INA, 8 U.S.C. § 1451(a), rather than materiality under section 10 of the DPA.  Thus, in his opening brief, Stelmokas said that the "current test of materiality is found in Kungys."  Br. at 47.  Indeed, in his "Statement of Issues" he included the following:  "Were the defendant's misrepresentations concerning his former occupation and residence 'material' as defined in Kungys v. United States, 485 U.S. 759 (1988)."  Under Kungys, a misrepresentation is material if it has

a natural tendency to affect the officers' decisions, in this case the decisions of the DPC analyst and the vice-consul. 485 U.S. at 770-72, 108 S.Ct. at 1546-47. Furthermore, it is clear from Kungys that a misrepresentation can be material even where if the truth had been told, the decision maker ultimately would have reached the same result. Under Kungys, the materiality of a misrepresentation in a denaturalization proceeding is a legal rather than a factual question. Id. at 772, 108 S.Ct. at 1547.

While the government continues to rely on Kungys, Stelmokas changed his position in his post-argument brief in which he now contends that "Kungys simply did not deal with the visa or DPA issues." Br. at 1. Furthermore, he cites United States v. Gaudin, 115 S.Ct. 2310 (1995), for the first time on this appeal in that brief, pointing out that the Supreme Court held there that materiality was a factual rather than a legal matter in the circumstances of that case. We would be justified in refusing to entertain Stelmokas's post-argument change in position, for we do not think that a party should be able to change his legal contentions after oral argument. But, mindful of the importance of this case to Stelmokas, we nonetheless will discuss his new position.

While we cannot predict the ultimate implications of Gaudin, we do know that Gaudin did not affect the Kungys holding that, in a denaturalization proceeding, materiality of a misrepresentation is a legal issue. Quite the contrary is true because the Gaudin court discussed Kungys at length and made it clear that it was distinguishing Kungys because that case dealt with whether "an appellate court must remand to a district court for a determination of materiality in a denaturalization proceeding," whereas Gaudin was concerned with a defendant's Sixth Amendment right to have a jury determine materiality in a criminal proceeding. Gaudin, 115 S.Ct. at 2319.

Of course, Gaudin followed a familiar track because it is not unusual for the Court to extend more extensive procedural protections to a defendant in a criminal case than to a party in a civil case. Indeed, as we point out above, the Court in Baxter v. Palmigiano distinguished Griffin v. California on the ground that Griffin, unlike Baxter, was a criminal case. Baxter, 425 U.S. at 317, 96 S.Ct. at 1557. Thus, while Gaudin may cause courts to cabin Kungys to the extent that it holds that a determination of materiality is a legal issue, Kungys's treatment of materiality as a legal issue remains applicable here.

Stelmokas now also seems to contend that because the procedure in an application for citizenship differs from that under section 10 of the DPA, the definition of what is material in Kungys is inapplicable here. In particular, in his post-argument brief, he contends that "Kungys simply did not deal with the visa or DPA eligibility issues." Br. at 1. This argument is distinct from Stelmokas's contention that materiality is a factual question. We reject this attempt to distinguish Kungys. While the procedures followed and questions asked when an applicant seeks a visa differ from those applicable when an applicant seeks citizenship, we see no reason why the test of materiality under Kungys would not apply in DPA eligibility

cases.  Materiality, after all, refers to the effect of a representation on a decision maker regardless of the nature of the decision.  In other words, no matter what is being decided, the misrepresentation is material under Kungys if it has the natural tendency to affect the decision.  We see no reason not to apply that test here.  Thus, Kungys is doubly significant here, for it establishes that the resolution of materiality is a legal undertaking and it sets forth the test of what is material.

Inasmuch as under Kungys the materiality of a misrepresentation in a denaturalization proceeding is a matter of law, not fact, there cannot possibly be a need for the government to produce evidence from officials that if the truth had been told the officers would have reached a different result.  Kungys, 485 U.S. at 772, 108 S.Ct. at 1547.  After all, evidence is not needed for a court to make a legal determination.  Thus, while the government frequently has produced evidence of that character, the effect of Kungys in 1988 has been to eliminate the need for such evidence, if it ever was required.

We do not go so far as to suggest that evidence of what a consular or DPC official would have done if given the correct information is not admissible because we have no need to reach that point.  Indeed, we even will assume that in a close case evidence of that character would be useful for the court in making a legal determination concerning the materiality of a misrepresentation.  After all, the Supreme Court, prior to Kungysin Fedorenko v. United States, quoted and relied on such evidence produced by the government, though it noted that it was proffered and accepted by the court "[w]ithout objection" from the defendant.  449 U.S. at 448–50, 101 S.Ct. at 743–44.  Yet, in Fedorenko the court did say that the defendant was ineligible for a visa "as a matter of law."  Fedorenko, 449 U.S. at 509, 101 S.Ct. at 749.

Though we thus acknowledge that in a close case evidence of whether or not the consular official's decision would have been different if he knew the truth might be helpful to the court in deciding a materiality issue, this case is not close. In our view, it cannot reasonably be argued that Stelmokas's misrepresentation that he was a laborer and a school teacher when in fact he was an officer in the Schutzmannschaft and served in the Luftwaffe could not have had a natural tendency to influence the DPC analyst and the vice-consul.  Indeed, probably without recognizing the implications of his statement, Stelmokas admits as much, for in his post-argument brief he describes his fabricated wartime employment as a "neutral" factor in the decision to admit him to the United States.  Br. at 3.  He hardly could contend that a revelation of his real Schutzmannschaft and Luftwaffe service would have amounted to the disclosure of a "neutral" factor.

We have no doubt that if Stelmokas had told the truth about his service on behalf of Germany during World War II he never would have obtained his visa for permanent residency in the United States, and he never would have been naturalized.  After all, we have found that these activities disqualified him from securing displaced person status and from obtaining a visa.

Thus, the misrepresentations surely were material.  Of course, there is a certain irony in Stelmokas's contention that his misrepresentations were not material, because when he made them he must have recognized the need to hide the truth so that he could be admitted to this country.  At least we can discern no other motive that he might have had to conceal his wartime activities.  The truth is inescapable:  he invented his wartime history out of thin air so that he could be admitted to the United States and ultimately obtain citizenship.

We make an additional observation with respect to the custom of the government of calling consular or INS officials to testify that their decisions would have been different if they had known the truth.  As we have indicated, Stelmokas seems to believe that the materiality of a misrepresentation is a factual issue and reasons that the fact of materiality cannot be established without testimony as to what the consequence of the provision of truthful information to the decision maker would have been.  Yet, even treating materiality as a factual question, we see no reason why the district court as the trier of the fact could not conclude, without such testimony, that the misrepresentation had a natural tendency to affect the decision and thus was material.  We will not convert the government's custom in producing consular or INS testimony to establish the materiality of a misrepresentation into a requirement that it must do so, for we are not aware of any case which holds that the government must establish the materiality of a misrepresentation with testimony from a consular or INS officer that a truthful disclosure would have produced a different result.

We point out that our conclusion that evidence on materiality of a misrepresentation is not necessary is in harmony with our treatment of materiality in other contexts.  Bethel v. McAllister Bros., Inc., 81 F.3d 376 (3d Cir. 1996), is a recent example.  In Bethel, the plaintiff obtained a substantial verdict on a defamation claim.  Subsequently, the defendant moved for relief from the judgment entered on the verdict based on the plaintiff's testimony at an arbitration proceeding after the trial in the defamation case which was inconsistent with his earlier testimony at trial.  The district court granted relief and ordered a new trial on the defamation action.  The plaintiff appealed, and we affirmed.

Bethel is significant to this case because the district court and this court in Bethel were concerned with whether the "misrepresentation" was "material" to the plaintiff's case.  Id. at 385.  We held that it was not merely material, it was crucial. In entertaining the motion for relief from judgment, the district court developed a record establishing the misrepresentation by comparing the testimony at the trial and the arbitration.  But no witness testified that the misrepresentation was material. Rather, the district court, predicated on its own view of the record, concluded that it was material, and we reached the same conclusion using an identical methodology.  Thus, without citing Kungys, both courts in Bethel followed the Kungys formula of basing a determination of "the materiality of a statement . . . upon a factual evidentiary showing" and then making "an

interpretation of substantive law."  Kungys, 485 U.S. at 772, 108 S.Ct. at 1547 (omitting citation).  That procedure is exactly what the district court did here, and it is exactly what we do on this appeal.  In fact, materiality frequently is treated as a legal question, sometimes in a trial context as in Kungys, see In re Cohn, 54 F.3d 1108, 1115 (3d Cir. 1995), and sometimes in other proceedings.  See, e.g., United States v. Pelullo, 14 F.3d 881, 886 (3d Cir. 1994); United States v. Gray, 878 F.2d 702, 714 (3d Cir. 1989).


### E.  Comments on the dissent

We close the discussion portion of our opinion with comment on two aspects of Judge Aldisert's dissent, sections VII and VIII.  We do not address the rest of the dissent as our opinion adequately explains the bases for our conclusions and we do not regard the dissent as detracting from them.  We comment on his discussion in section VII of the dissent on Count IV of the complaint in which the government charged that Stelmokas illegally procured his naturalization because he misrepresented his wartime record to the DPC and to the vice-consul and thus was ineligible to enter the country.  We focus our attention on this point because Judge Aldisert includes in his dissent a concession which causes the dissent to self-destruct, namely  "that Stelmokas's failure to disclose his wartime military status would have had a natural tendency to influence immigration decisions."  Dissent typescript at 29.

Initially on this point we reiterate that 8 U.S.C. § 1451(a) provides in the disjunctive for a certificate of naturalization to be revoked if it was "illegally procured" or was "procured by concealment of a material fact or by willful misrepresentation."  In an "illegally procured" case, the alien obtains his naturalization illegally, in this case the illegality being that Stelmokas was not eligible for naturalization as he was not admissible into the United States.  In a "procured by" case, the alien obtains his naturalization by concealment of a material fact or by misrepresentation.  While Judge Aldisert asserts that the government attempted in Count IV to rely on the "procured by" language, in that count the references to Stelmokas's misrepresentations to the DPC analyst and the vice-counsel were germane only to the "illegally procured" component of section 1451(a).  Thus, Judge Aldisert's suggestion that Count IV of the complaint related in any way to the "procured by" language of section 1451(a) is simply not true.  Furthermore, while the government unsuccessfully did use Stelmokas's misrepresentations to the DPC analyst and the vice-consul in the only count of its complaint asserting a "procured by" charge, Count VII, the government does not pursue its case on that count on this appeal.

Judge Aldisert then indicates, quite correctly, that the government's case on Count IV begins with the major premises that DPA § 10, 62 Stat. 1013, barred from immigration any person who willfully misrepresented material facts to gain entry as a displaced person.  He then correctly indicates that the

government argues that Stelmokas made material misrepresentations so that his entry was unlawful and he thus illegally procured his naturalization. He then indicates that the "critical inquiry is whether the government met its important threshold burden of proving a misrepresentation as defined in the Displaced Persons Act." Dissent typescript At 27. (Emphasis added.)

The problem with the foregoing statement is inclusion of the word "threshold" for if the government established that Stelmokas made material misrepresentations to the DPC analyst and the vice-consul the case is over and the government wins. Why is this so? The answer is quite clear. DPA § 10 provides that any "person who shall willfully make a misrepresentation for the purpose of gaining admission into the United States as an eligible displaced person shall thereafter not be admissible into the United States." Of course, as we already have explained, that person is thus ineligible for naturalization.

Rather, as Judge Aldisert acknowledges, the test of materiality comes from Kungys, i.e., does the misrepresentation have a natural tendency to influence or was it capable of influencing the decision of the decision making body to which it was addressed? While it appears that Judge Aldisert is reluctant to acknowledge that Stelmokas's lies to the DPC analyst and the vice-consul about his wartime activities were material, we reiterate that he does concede "that Stelmokas' failure to disclose his wartime military status would have had a natural tendency to influence immigration decisions." Dissent typescript at 29. Under Kungys the misrepresentations were therefore material without any showing of their effect on the DPC analyst or the vice-consul.

Notwithstanding the clear statutory scheme, Judge Aldisert either tries to add more elements to the definition of materiality or to demonstrate that the government had to show that the misrepresentations led to Stelmokas's admission into the country. As we have indicated, the government has demonstrated the Stelmokas's misrepresentations led to his admission into the United States but it did not have to do so. Nevertheless we address the point Judge Aldisert makes. Judge Aldisert fails in this effort to demonstrate that the government had to demonstrate anything beyond the conceded fact that Stelmokas's misrepresentations had a natural tendency to influence the immigration decisions. The reason he fails is that he relies on principles inapplicable in a case under the "illegally procured" clause of section 1451(a) when the case is predicated, as is this case in Count IV, on an alien having made a material misrepresentation under DPA § 10 for the purpose of gaining admission into the United States. Thus, Judge Aldisert makes the following statement which is simply wrong in this "illegally procured" case under section 1451(a): "In denaturalization cases, equally important to establishing a material statement is the presentation of evidence that the misrepresentation procured the order and certificate of naturalization." Dissent typescript at 29. The problem with the statement is that in "illegally procured" cases there is no requirement that a misrepresentation enabled the alien to procure anything. Rather, in an illegally

procured case dependent on a misrepresentation made when the alien sought admission into the United States, under DPA § 10 the government merely need prove that the misrepresentation for the purpose of obtaining admission into the United States was material. Furthermore, Judge Aldisert's statement is wrong for the additional reason that Stelmokas did not make his misrepresentations to procure the order and certificate of naturalization. He made them to obtain displaced person status and to be admitted into the United States.

We reiterate that Stelmokas's misrepresentations to the DPC analyst and the vice-consul are significant because under DPA § 10 an alien who makes a material misrepresentation thereafter is not admissible into the United States. Thus, if an alien who made a material misrepresentation is admitted and is naturalized, he has illegally procured his naturalization without regard for whether he procured anything by the misrepresentation. We further emphasize that DPA § 10 in the clearest possible terms speaks prospectively, i.e., "thereafter" an alien making misrepresentations is not admissible into the United States. Accordingly, it is clear beyond doubt that once Stelmokas made his misrepresentations to the DPC analyst and the vice-consul, he was ineligible to enter the United States, because, in Judge Aldisert's words, his "failure to disclose his wartime military status would have had a natural tendency to influence immigration decisions." Accordingly, Stelmokas could not be naturalized and he illegally procured his citizenship. Nothing in DPA § 10 requires that the alien procure his admission into the United States or anything else by his misrepresentations for even if the misrepresentations are uncovered immediately, so that the alien does not obtain displaced persons status or is not admitted to the United States, he is ineligible for admission to the United States after he makes his misrepresentations.

For reasons that must be driven by Judge Aldisert's sense that there is something unfair in the prosecution of this case he continues to develop his dissent along the same erroneous lines that we have described. Thus, he points out that in Kungys"the government was obligated to demonstrate that Kungys' citizenship status was procured by his material misrepresentations." Dissent typescript at 29. He then inferentially acknowledges that Kungys was not an "illegally procured" case but was a case where the naturalization was "procured by concealment of a material fact or by willful misrepresentation," for he recites that the "Government seems to ask this court to apply different meanings to the term 'procured' in the two clauses of § 1451(a)." Id. at 29-30. He argues that "[t]here is no rational support for the suggestion that Congress intended such an anomalistic reading of the same word in the same section of the same statute. There is absolutely no rational support for the notion that the government is not required to produce evidence showing precisely how Stelmokas was 'unlawfullyadmitted' and whether his naturalization was in fact 'illegally procured.'" Id. at 30. "If under the second clause in § 1451 the government must show that the naturalization was 'procured by' the alleged misrepresentation, as the Court held in Kungys,

then under the first clause certainly the government must demonstrate that Stelmokas was ineligible and therefore unlawfully admitted."  Id.

The problem with the foregoing quoted language from the dissent is obvious.  The government did demonstrate, in Judge Aldisert's words, that Stelmokas "was ineligible and therefore unlawfully admitted."  The government demonstrated that Stelmokas made a material misrepresentation under DPA § 10, which representation we once again point out did not have to result in Stelmokas procuring anything to violate that section.  Thus, Stelmokas illegally procured his naturalization.  Nothing could be clearer.

It is also clear that in the "illegally procured" and "procured by" clauses, "procured" has the same meaning and the government does not contend otherwise.  We repeat the distinction between the two types of cases.  In a "procured by" case the alien obtains his naturalization by his misrepresentation.  In an "illegally procured" case the alien obtains his naturalization illegally, in Stelmokas's case by entering the country when he could not be admitted.  Thus, "procured" means the same thing in "illegally procured" and "procured by" cases.  What differs is the interdicted conduct by which the alien procured his naturalization.

Of course, there is a good reason why the "procured by" clause in section 1451(a) requires that the government demonstrate more than that an alien made a material misrepresentation for naturalization to be revoked because, unlike DPA § 10 which applies prospectively so as to render an alien inadmissible to the United States, section 1451(a) always applies in a situation in which the alien already has procured his naturalization.  Thus, Judge Aldisert's emphasized quotation of Kungys that "the naturalized citizen must have procured citizenship as a result of the misrepresentation or concealment," 485 U.S. at 767, 108 S.Ct. at 1544, dissent typescript at 31, does not support his position because there the Court was discussing a "procured by" not an "illegally procured" case. Judge Aldisert goes further in misusing the plain language of Kungys.  First, he correctly says that Kungys indicates that in a denaturalization proceeding there are "four independent requirements."  Dissent typescript at 31.  In fact, the Court said the following with respect to a "procured by" case under section 1451(a):

So understood, the provision plainly contains four independent requirements:  the naturalized citizen must have misrepresented or concealed some fact, the misrepresentation or concealment must have been willful, the fact must have been material, and the naturalized citizen must have procured citizenship as a result of the misrepresentation or concealment.

Kungys, 485 U.S. at 767, 108 S.Ct. 1544-45.

Yet this language does not help Stelmokas for in the

quotation the Court was not discussing an "illegally procured" case. Rather, it set forth the elements of a "procured by" case. Furthermore, the Court emphasized that the requirements were "independent." Thus, it is impossible to read the statement in Kungys that the naturalized citizen have procured citizenship as a result of the misrepresentation into the materiality requirement of a misrepresentation under DPA § 10. The materiality and procurement considerations are "independent" of each other and cannot be fused. Furthermore, the requirement in a "procured by" case that the misrepresentation have resulted in the alien obtaining citizenship cannot be attached to the government's burden to show that Stelmokas's misrepresentations to obtain displaced person status and a visa in this "illegally procured" case were material. Thus, Judge Aldisert's concession that Stelmokas's misrepresentations would have had a natural tendency to influence the immigration decisions should lead him to vote to affirm even if he rejects, as he does, the rest of the government's case, for as we explained above, if the government establishes that Stelmokas illegally procured his naturalization for a single reason we must affirm the district court.

Judge Aldisert discusses the possibility of the government producing evidence of what consular officials would have done if Stelmokas had not deceived them but we will not discuss this point as we have addressed it above. Eventually he gets back to his central theme on Count IV but at that point he inexplicably compounds his errors for he says that "the government has not met its high burden of proof in this case because it failed to produce evidence that Stelmokas' misrepresentations procured the decision of the DPC analyst and the naturalization officials." Dissent typescript at 38. (Emphasis added.) Of course, the "naturalization officials" have nothing to do with this case on Count IV and thus the government does not contend that any misrepresentation to them is germane to that count. Furthermore, the government did not have to show that Stelmokas's misrepresentations to the DPC analyst and the vice-consul procured the decision of the naturalization officials to grant naturalization as the misrepresentations were critical as they led to his admission into the United States.

The second aspect of Judge Aldisert's dissent on which we comment is part VIII in which he expresses due process and fairness concerns. We point out that Stelmokas does not contend that the prosecution of the case has denied him due process of law. Accordingly, this court should not be concerned with Judge Aldisert's observation that with the passage of time "witnesses disappear and memories fade." Dissent typescript at 42. In any event, lest too many tears be shed for Stelmokas, we point out that one witness has not disappeared and we have no reason to believe his memory has faded. That witness, of course, is Stelmokas himself who with so much at stake persisted in his plea of the privilege against self-incrimination notwithstanding the order of the district court overruling the plea.


III. CONCLUSION

After a careful examination of this matter, we have concluded that the district court made no errors of law and that the record fully supports and, in fact, compels the district court's conclusion that Stelmokas did not qualify for admission to this country as a displaced person. Thus the district court correctly revoked his citizenship and ordered him to surrender his certificate of naturalization. While many years have passed since his admission to the country and his obtaining of citizenship, it is not too late to remedy the wrong done when he was admitted. Accordingly, we will affirm the judgment of August 2, 1995.

UNITED STATES v. STELMOKAS - NO. 95-1894

STAPLETON, J., Concurring:

I feel compelled to write separately because an accusation of personal participation in the atrocities of the Holocaust is a grave matter, and a judicial finding of such participation understandably carries with it extrajudicial, collateral consequences unrelated to citizenship and deportability. While I agree with the court that the government has carried its burden on six counts of its complaint, I conclude that the evidence of Stelmokas' participation in the Grosse Aktion (Great Action) is not clear, convincing and unequivocal, and that the district court clearly erred in finding otherwise.

To be sure, there is substantial evidence that Stelmokas was a member of a platoon of the 3rd Company of the 3rd Battalion of the Lithuanian Schutzmannschaft and was not on leave on the date of the Great Action. Moreover, there is substantive evidence that Lithuanians in military uniforms aided the Germans in the mass execution. It is a matter of speculation, however, whether all, some or none of Stelmokas' Schutzmannschaft Battalion participated.

On October 28-29, 1941, German troops, aided by "Lithuanian partisans," conducted an operation they referred to as the Great Action which resulted in the execution of 9,200 Jews from the ghetto in Vilijampole. On the morning of October 28, the Jews were lined up by the Jewish Ghetto Police, and the Germans culled out those who were and were not fit to work. Those not fit to work were marched to the "small ghetto," which was adjacent to Vilijampole, and the next day they were marched, in groups of five hundred at a time, to Fort IX and executed. They were buried in mass graves dug by Soviet prisoners of war. Two survivors from Vilijampole testified that they saw Lithuanians in military uniforms aid the Germans in the Great Action, but they did not identify whether the men were from

Stelmokas' Schutzmannschaft Battalion or from some other Lithuanian group.

No testimony and no documentary evidence directly links Stelmokas or the 3rd Battalion to the Great Action. The district court, in finding participation by Stelmokas, relied largely on the opinion of Dr. Raul Hilberg that the entire 3rd Battalion must have participated in the Great Action. Dr. Hilberg's opinion was based almost entirely on two observations. First, he had "seen documents in which larger forces than one battalion were deployed to kill fewer than 10,000 people." App. at 411. From this, he inferred that in addition to the personnel of the Einsatzkommando 3, the German unit of security police which carried out the operation, at least 500 men, a full battalion, were required for the Great Action. He acknowledged, however, that the minimum number of men required would vary according to factors such as the terrain and the degree of resistance from the Jews. Second, there was a "shortage of manpower" because German and Lithuanian units stationed near Kaunas had been sent to fight the Soviets. Specifically, the majority of the German 11th Reserve Police Battalion and the entire 2d Lithuanian Battalion were in Byelorussia. Putting these two observations together, Dr. Hilberg concluded that Stelmokas' entire Battalion must have assisted in the Great Action. The balance of the 11th Reserve Police Battalion and the ghetto police would not, in his opinion, be sufficient in the absence of the entire 3rd Battalion of the Lithuanian Schutzmannschaft.

I do not question in the least Dr. Hilberg's qualifications as an expert in Holocaust history, nor do I doubt the conviction with which he believes Stelmokas participated in the Great Action. Nevertheless, I cannot conclude that his observations, by themselves, clearly, convincingly and unequivocally demonstrate that Stelmokas aided the Germans in their massacre of October 28th and 29th. Dr. Hilberg believed a full battalion was required based on the number of men used in mass executions elsewhere about which he had read. He did not, however, describe the circumstances of the other mass executions and admitted that the minimum requirement would vary according to local conditions and the resistance level. He did not identify any local conditions that would have made the Great Action a particularly labor intensive operation and candidly acknowledged, based on contemporary documentation, that no Jewish resistance was anticipated. He also testified that it was reasonable to assume that some segment of the available manpower would have to have been assigned to the responsibilities that occupied the available troops on a day to day basis, e.g., protection of facilities and communication and the maintenance of security. Given the uncertainty involved in estimating manpower needs based on other, perhaps dissimilar, situations and the reasonable assumption that there were competing manpower demands in the local area, it seems speculative to assert that the entire 3rd Battalion participated despite the presence of a portion of the 11th Reserve Police Battalion and the ghetto police.

My concern, however, is not grounded solely in the sufficiency of Dr. Hilberg's testimony; as Stelmokas points out,

the government's own evidence casts serious doubt on the inferences drawn by Dr. Hilberg.  Certain documents suggest that a sizable contingent of Lithuanians not associated with the Sonderkommando was available to help in the Great Action, and that less than a full battalion of support troops may have been needed.  To make my point, a little background regarding the organization of German police forces is helpful.

Following the occupation of Lithuania by the German Army, German occupation police moved in and kept order.  One component of the German occupation police was the security police; the other component was the order police.  The security police had mobile units called Einsatzgruppen, about the size of a battalion, and these were broken down into companies called Einsatzkommando and Sonderkommando.  The Einsatzgruppen were in charge of exterminating Jews and other "undesirable" elements of the population.  Einsatzgruppen A was assigned to Lithuania and other Baltic states, and its subdivision Einsatzkommando 3, commanded by Colonel Jaeger, operated in the area including Kaunas.  The order police were much larger than the security police, and included the 11th Reserve Police Battalion mentioned by Dr. Hilberg.

A government exhibit indicates that in addition to Einsatzkommando 3, a sizable contingent of Sonderkommando was available in the Kaunas area.  This exhibit, entitled "USSR Situation Report No. 19" and dated July 11, 1941, was prepared for the Chief of Security Police and has a section devoted to the situation in Kaunas.  In this section, the report states that "We have retained approximately 205 Lithuanian partisans as a Sonderkommando, sustained them and deployed them for executions as necessary even outside the area."  App. at 1861.  The availability of nearly a half-battalion of Sonderkommando substantially undermines the conclusion that the entire 3rd Battalion of the Schutzmannschaft was necessary to carry out the Great Action.

In addition to this Situation Report No. 19, there is another contemporaneously prepared document that calls Dr. Hilberg's opinion into question.  As I have noted, Colonel Jaeger commanded the Einsatzkommando 3, the unit of German security police assigned to the Kaunas area.  Colonel Jaeger prepared a report, the Jaeger Report, which is dated December 10, 1941, and which refers to the Great Action and many other executions of Jews.  Colonel Jaeger there wrote the following chilling lines:

> The goal to make Lithuania "Jew free" could only be attained through the formation of a mobile detachment with specially selected men under the leadership of SS Obersturmfuhrer Hamann who shared my goals completely and who would guarantee the cooperation of the Lithuanian partisans and the existing civil offices.
>
> The carrying-out of such actions is, in the first place, a question of organization. . . .  The Jews had to be collected in one or

in several locations.  Based on the numbers
[of Jews] a place for the necessary pits had
to be found and dug up. . . .  The Jews were
transported to the execution site in groups
of 500 and in intervals of at least 2 km.
What difficulties and nerve-racking work that
had to be accomplished is shown in the
following random example:

     In Rokiskis, 3,208 people were to be
transported 4 1/2 km  before they could be
liquidated.  In order to accomplish this work
in 24 hours, 60 of the 80 available
Lithuanian partisans had to be detailed for
transport duty and perimeter security.  The
remainder, who had to be repeatedly relieved,
carried out the work with my men. . . .
Attempts to escape that happened here and
there were prevented entirely by my men and
with some danger to their lives. . . .  Only
through skillful use of time was it possible
to carry out up to 5 actions in a week's time
and to handle the work that had accumulated
in Kaunas so that no bottlenecks occurred in
the official functions.

     The actions in Kaunas itself, where
there were sufficient reasonably well-trained
partisans available, were virtually duck
shoots compared with the enormous
difficulties which were often encountered
elsewhere.

     All leaders and men in my detachment in
Kaunas took an active part in the major
actions in Kaunas.
     . . .
App. 1133-34.
     Colonel Jaeger reports the executions of thousands of
Jews and hundreds of others in such an impersonal, matter-of-fact
manner and with such pride that his account leaves one in a
horror-driven state of shock.  Nevertheless, the Jaeger Report,
as documentary evidence, is important in the present context for
a number of reasons.  First, in the context of a somewhat smaller
but nevertheless substantial mass execution, it provides a
contemporary estimate of the manpower necessary to perform the
grizzly task of mass execution from a German official having
responsibility for carrying out those executions.  The report
indicates that the mass execution of 3,208 people at Rokiskis was
carried out by Einsatzkommando 3 personnel with the assistance of
only 80 "Lithuanian partisans."
     Second, while Rokiskis provides an example of a mass
execution with "enormous difficulties," the execution of "2007
Jews, 2,920 Jewesses, and 4,273 Jewish children" in the course of

the Great Action did not present comparable problems. App. at 1129.

Putting these two pieces of evidence together, even if one assumes that the number of potential victims in the Great Action would require substantially more support from "Lithuanian partisans" than was employed in Rokiskis, Dr. Hilberg's insistence that a minimum of 500, in addition to the Einsatzkommando 3 personnel, seems questionable, at least in the absence of more explanation than he was able to give.

Finally, the Lithuanian partisans who in fact participated in the Great Action are described as "reasonably well trained." When one puts this together with the U.S.S.R. Special Report 19's indication that approximately 205 Lithuanian partisans had been formed into a Sonderkommando company specifically to be "deployed . . . for executions as necessary," the most likely inference is that at least a large segment of the need for Lithuanian participants during the Great Action were met by Lithuanians who were not from the Schutzmannschaft 3rd Battalion. In suggesting that this is the likely inference, I am not unmindful of Dr. Hilberg's opinion that the reference to "reasonably well trained partisans" in the Jaeger Report meant Schutzmannschaft personnel. The basis for that opinion, in its entirety, is found in the following excerpt from his testimony:

> In this report, Jaeger is trying to impress his superiors. That's a very common phenomenon in reporting. And so he, first of all, calls attention to the difficulties and complexities of organizing such an operation. He refers to thorough preparation of each individual action and knowledge of the conditions in the area in question. . . .
>
> He then goes into some examples of towns and then, referring on top of page 30 of the English translation, he says that the actions encompass itself a little bit easier because there were well trained partisans, as he calls them. Now what he is referring to, of course, is the schutzmannschaft. And the reference to the training can be explained by the fact that right from the start [of the schutzmannschaft], June 28th, 1941, the call went out for volunteers who had military experience. In other words, these people knew how to fire a weapon, they knew how to hit their target. And for that reason, the operation was, in his view, like shooting at a parade. It was well coordinated and well done.

App. at 277, 277-78. Dr. Hilberg's inference is a plausible one. However, once one is aware that a group of Lithuanian partisans had been formed and were available specifically for this purpose, I believe another inference becomes the more plausible one.

I acknowledge that the inferences I suggest based on the Jaeger Report and Special Report No. 19 do not constitute clear, convincing and unequivocal evidence that Stelmokas did notparticipate in the Great Action. He may well have participated. It was the government's burden, however, to produce clear, convincing, and unequivocal evidence that Stelmokas didparticipate. In my view, it did not come anywhere close to carrying that burden.

While the district court reached its conclusion about Stelmokas's participation in the Great Action without reference to his failure to testify at the trial, it noted that it believed an inference could appropriately be drawn from that failure which confirmed its conclusion. I agree with the district court that the Fifth Amendment did not foreclose it from drawing a negative inference from Stelmokas's failure to explain what he was doing on October 28 and 29, 1941. As the Supreme Court cautioned in Baxter v. Palmigiano, 425 U.S. 308, 318 (1976), however, a party's silence should not be given "more evidentiary value than [is] warranted by the facts surrounding [the] case." Here, Stelmokas stands accused of a number of different forms of conduct, any one of which would warrant the revocation of his citizenship. If Stelmokas had taken the stand and denied participation in the Great Action, he would have subjected himself to cross-examination that almost certainly would have established another ground for revocation. Under these circumstances, I do not believe any appropriate, negative inference from silence can boost Dr. Hilberg's speculative opinion into the realm of clear, convincing and unequivocal evidence.

Finally, I turn to the dissent's conclusion that there is insufficient evidence to support the district court's finding regarding Stelmokas's guarding of the Vilijampole ghetto. In contrast to the state of the record regarding Stelmokas's participation in the Great Action, I find the evidence supporting this finding to be clear, convincing, and unequivocal.

The finding at issue reads as follows:

> The Court finds that the Government has not established by clear, unequivocal, and convincing evidence that the shootings on September 16-17, 1941 were carried out by either the defendant or Schutzmannschaft members under his command. However, the Government has established by clear, unequivocal, and convincing evidence that defendant was commander of the ghetto guard for a 24-hour period commencing September 16, 1941, at 1 p.m., that Jews in the ghetto were subject to extreme deprivation, brutality, and arbitrary shootings during that period, and that defendant was responsible for enforcing the confinement of Jews in such conditions.

On September 1, 1941, Stelmokas's Battalion Commander

entered the following order:

TO THE 3rd AUXILIARY POLICE SERVICE BATTALION
Order Number 1, Secret
Kaunas, 1 September 1941
Operations Section
§ 1.

I announce the Battalion's schedule of guard deployments and positions:

| Guard Post Number | Guard duties | Guard place of assignment | Number on Duty | Purpose |
|---|---|---|---|---|
| 3 | Guard at the captured ammunition warehouse | Vilijampole, VIII Fort | 4 | To guard the ammunition warehouse |
| 21 | "Ghetto guard" | Vilijampole, Veliuonos street | 17 | 32 Not to let a single Jew out of the closed quarter |

Two weeks later, on September 15, 1941, the same Battalion Commander entered another order, section 1 of which made the following duty assignments:

Security and service duties for 16 September of the current year:

Battalion Duty Officer Junior Lieutenant TAMULAITIS, VYTAUTAS

Assistant to the Duty Officer – Corporal KVARACIEJUS

Duty Clerk at the Battalion Headquarters – Corporate AUKSORAITIS

Guard Commander in Vilijampole – Junior Lieutenant STELMOKAS

Guards from the 3rd Company

While this order was lengthy and dealt with a variety of subjects, these were the only current duty assignments recorded.

The record discloses that the ghetto was located in a section of the city called "Vilijampole" and that "Vilijampole" was frequently used as a synonym for the ghetto. As Stelmokas stresses, the record also indicated, however, that Fort VIII, while in the area called Vilijampole, was not in the ghetto. Based on this evidence, Stelmokas suggests that the order assigning him as "Guard Commander in Vilijampole" is ambiguous –– that the assignment might have been merely to guard ammunition at Fort VIII.

While I agree with Stelmokas that the government had the burden of proving Stelmokas's participation in the persecution of Jews by clear, convincing and unequivocal evidence, his suggestion of a significant ambiguity in the record is unpersuasive. Dr. Hilberg and the September 1st order itself indicate that in the context of guard duty, the words "Fort VIII" was generally included in the designation of that guard post in order to distinguish duty there from the duty of guarding the ghetto. More importantly, Stelmokas commanded a platoon consisting of something over 30 men and it is far more likely that he was given responsibility for Guard Post 21 or both Guard Posts 21 and 3, than that he commanded only the four guards at Fort VIII. Finally, and most importantly, the September 15th order reports only two command assignments: the "Battalion Duty Officer" and the "Guard Commander at Vilijampole." The suggestion that this order would record the identity of the commander of a four man unit at Fort VIII and omit entirely any mention of the Guard Commander of the ghetto strikes me as too far fetched to raise even a reasonable doubt.

United States v. Jonas Stelmokas, No. 95-1894

ALDISERT, Circuit Judge, dissenting:

Again we are faced with a denaturalization proceeding brought by the Office of Special Investigations (OSI) against an American octogenarian for events that took place during the Nazi occupation of Europe more than 50 years ago. Although stripping an American of his citizenship is a civil proceeding, the effect is so drastic that the government's burden is "substantially identical with that required in criminal cases--proof beyond a reasonable doubt." Klapprott v. United States, 335 U.S. 601, 611-612 (1949).

The predicate acts that form the basis of OSI prosecutions take place in the midst of what must be acknowledged to be the most craven and pusillanimous crime ever sponsored by a nation-- the Holocaust effectuated by the German Third Reich in the 1930s and 1940s. This case is no exception.

The inhuman Nazi brutality that underlies these cases makes especially arduous our obligation to require the government's high burden of proof, but the law commands that we do just that, and rightly so. Indeed, faced with a backdrop of such monstrous and inhuman past behavior, a court's responsibility in 1996 to insure the maximum protection of the law constitutes America's best response to the Nazi juggernaut that crushed all semblance of justice and freedom, and millions of innocent lives a half century ago.

The district court revoked the citizenship of Jonas Stelmokas because he joined and served in the Lithuanian 3rd Auxiliary Police Service Battalion in 1941. At the time, he was a 25-year-old junior lieutenant. The court ruled in favor of the government on six separate, but related counts. It determined that Stelmokas: voluntarily assisted the enemy in persecuting civil populations, particularly on September 16, 1941 and October 28-29, 1941 (Count I); voluntarily assisted German forces in military operations against the United States and its allies (Count II); voluntarily joined and participated in a movement hostile to the United States (Count III); advocated or acquiesced in conduct contrary to civilization and human decency (Count V);

lacked good moral character by virtue of his Schutzmannschaftmembership (Count VI); and willfully misrepresented material facts in his application for admission to the United States as a displaced person (Count IV). I would reverse the district court's determination on each count. Accordingly I dissent.

What we as U.S. Circuit judges know as men and women requires us to despise the loathsome conduct of the Nazis in World War II. Knowledge of the Third Reich's intentional brutalization and annihilation of innocent civilians is ingrained in our senses as a revulsion of the worst genocide of the modern era, if not of all time. Our role as appellate judges, however, is not to proclaim our visceral reactions to the horrors of history. Rather, we must confine ourselves to the trial record in this case and decide, as a dispassionate reviewing court, whether the OSI has proved by "clear, unequivocal, and convincing evidence which does not leave the issue in doubt" that Stelmokas in fact committed the alleged acts and that such conduct supports a denaturalization proceeding. Schneiderman v. United States, 320 U.S. 118, 158 (1943). This the OSI has not done.

The OSI's case against Stelmokas does not rest on direct evidence but solely on a series of rickety inferences that do not rise to the high level of proof demanded of the government. To this unimpressive framework has been added what the district court describes as adverse inferences drawn from Stelmokas' decision to exercise his Fifth Amendment privilege to refrain from testifying at trial. See Dist. Ct. Op. at 47. The Supreme Court has established that a defendant's Fifth Amendment plea in a denaturalization case constitutes the basis for adverse inferences only to the extent those inferences are supported by "substantial evidence manifested in the record." Baxter v. Palmigiano, 425 U.S. 308, 317-18 (1976). The OSI's case against Stelmokas lacks such substantial evidence and is hobbled by several fundamental weaknesses, which together are fatal to the OSI's attempt to meet the unusually high burden of proof required.

First, the OSI has been unable to present even one eye-witness to support its charges. Second, the OSI failed to present any direct evidence or any legitimate circumstantial evidence of participation in proscribed activity that would, as required, logically and unerringly support an incriminating inference. Instead, the OSI relied on as many as five layers of inference to conclude that: (1) that Stelmokas was responsible for confining Jews in the Kaunas, Lithuania ghetto when two Jews were shot on September 17, 1941 and (2) he participated in the massacre of thousands of Jews in the Grosse Aktion at the same location on October 28-29, 1941. Third, the OSI supported its allegations by introducing undated documents, without accompanying testimony as to their relevance and effect on immigration officials at the relevant times. Fourth, and especially fatal to its case, the OSI failed to present testimony from Displaced Persons Commission personnel or consular officials--as it has in all similar cases--that Stelmokas' non-disclosure of his 3rd Battalion service in fact impacted or would have impacted the immigration officials' decision-making process

and rendered him ineligible for a visa.  For these reasons, I would reverse the district court's judgment of denaturalization.

I.

Before analyzing the specific legal questions presented here, I must describe conditions in Europe, and particularly in the displaced-persons camps, at the time Stelmokas applied for his visa in July, 1949.  I start with V-E Day, May 8, 1945.  Notwithstanding the presence of European nation-states, the power to rearrange the map of Europe had passed to the United States and the Soviet Union.  Although Hitler's Reich had come to an end, at its peak the Nazi empire had stretched from the French port of Brest to the Caucasus and from the tip of Norway to the border of Egypt.  As part of its rampage, the Nazi war machine smashed into Lithuania on June 22, 1941; three days later it occupied Kaunas, what was then the Lithuanian capital.

By the end of the six-year struggle to bring down the Nazi empire, an estimated 40 million Europeans had lost their lives-- in combat, under the bombs that obliterated cities, through Hitler's methodical genocide, or simply from hunger, cold and disease.  At the end of the war, the state of Germany had ceased to exist.  An innumerable mass of civilians, freed prisoners and the first waves of 13 million refugees from Eastern Europe wandered the country.  Nearly eight million Germans were homeless.  People bartered household necessities for food and clothing, often subsisting on little more than 1,000 calories a day.

The onset of a chill between the Soviets and the Western allies sealed the division of the country between two hostile occupation zones.  By 1947 it was becoming clear that Stalin had no intention of fulfilling his promise, made to Roosevelt and Churchill at Yalta, to hold free elections in Poland.  Where the Red Army stood, Soviet power reigned, straining westward.  A Communist insurgency, supported from bases in Bulgaria, Albania and Yugoslavia, threatened the vulnerable British-backed monarchy in Greece.  Soviet pressure mounted against Turkey for control of the Black Sea straits.

Such was the political climate surrounding the displaced-persons camps when Stelmokas applied for his visa in 1949 at Hamburg, Germany.  Refugees were caught in a vicious political struggle between the two superpowers.  With American and Soviet diplomatic armies posturing eyeball-to-eyeball, the de factodivision of Germany already had taken place.  The die having been cast in both the west and the east by the occupying armies, Central Europe remained the primary political battleground for almost a decade after V-E Day.

It is against this complex and volatile political background that I consider the legal issues arising from Stelmokas' visa application.  Indeed, the facts underlying the legal issues must be viewed as they existed in the harsh environment of a battered and shattered post-war Europe, not as they might be viewed from the cozy environment of a 1996 federal courtroom.

I agree with the government that the wartime Lithuanian and German documents generated in Lithuania and obtained by the OSI

from archives are admissible.  However, I question whether these documents alone are sufficient to support the government's high burden of proof.

II.

I turn first to Count I, the linchpin of the government's entire case against Stelmokas.  In Count I the government alleges that Stelmokas voluntarily assisted the Nazis in persecuting civilian populations.  The OSI anchors this contention on the events of September 16-17, 1941 and October 28-29, 1941.

A.    September 16-17, 1941

I accept that Order #10 of the 3rd Auxiliary Police Service Battalion, dated September 15, 1941, indicates that "Junior Lieutenant STELMOKAS" was detailed as "Guard Commander in Vilijampole."  A1316.  From this, and from evidence that two Jews were killed in the Kaunas ghetto between September 16 and 17, 1941, the district court reached the following conclusion:

> The Court finds that the Government has not established by clear, unequivocal, and convincing evidence that the shootings on September 16-17, 1941 were carried out by either the defendant or Schutzmannschaft members under his command.  However, the Government has established by clear, unequivocal, and convincing evidence that defendant was commander of the ghetto guard for a 24-hour period commencing September 16, 1941, at 1 p.m., that Jews in the ghetto were subject to extreme deprivation, brutality, and arbitrary shootings during that period, and that defendant was responsible for enforcing the confinement of Jews in such conditions.

F.F.60

A conclusory inference predicated on a clear and narrowly established fact might have been sufficient to inculpate Stelmokas.  However, an inference teased from a series of other inferences may not substitute for hard evidence where the government's burden is so high.  And that is the extent of the government's case and that is also why the district court found that "the government has not established by clear, unequivocal, and convincing evidence that the shootings on September 16-17, 1941 were carried out by either the defendant or Schutzmannschaftmembers under his command." F.F. 60.  The district court went further, however, and concluded that Stelmokas was commander of the ghetto guard and enforced confinement of Jews in horrible conditions.  Because the government did not meet its high burden of proving these aspects of its allegations, the district court erred.

1.

Unlike virtually every other case prosecuted by the Office of Special Investigations, here no direct evidence shows that Stelmokas confined Jews to the ghetto during the days in question.  Indeed, the direct evidence presented in this case is limited to the following: That deployed in the Kaunas, Lithuania

area were at least two Lithuanian army units under the control of the Nazis--the 3rd Auxiliary Police Service Battalion (also described hereafter as Schutzmannschaft), in which Stelmokas was an officer, and a Sonderkommando company of approximately 205 Lithuanian partisans, in which Stelmokas was not a member; that Stelmokas was listed as "Guard Commander in Vilijampole" of the 3rd Battalion; that shootings of Jews in the ghetto by Nazis and Lithuanians frequently occurred; and that two Jews were killed in the ghetto on September 17.

It is uncontradicted that "Vilijampole" was a neighborhood containing not only the ghetto, but also surrounding areas including Fort VIII, which was situated 100 meters or more from one border of the ghetto. It bears repeating that although Stelmokas is accused of commanding the Vilijampole guard on this day, there is no direct proof that he commanded the ghetto guard and was responsible for enforcing the confinement of Jews in the ghetto. We are left to infer that a single written order that Stelmokas was "Guard Commander in Vilijampole" demonstrates that the 3rd Battalion, and not the Sonderkommando company, was the ghetto guard on this day. We are left to speculate whether the 3rd Battalion was not merely assigned to guard adjacent areas, including bridges, warehouses, ammunition depots etc. A518-A519. The evidence leaves unanswered the question of whether the unit patrolled parts of the Vilijampole neighborhood that did not include the ghetto--an area that also encompassed non-Jewish residences, businesses and an ammunition warehouse--the ghetto itself, or both. To repeat, there was no direct evidence supporting the district court's determination and the quality of circumstantial evidence was so inferior that it did not satisfy the government's high burden of proof.

No evidence supported the district court's conclusion other than the fact that Stelmokas was assigned as "Guard commander of Vilijampole" at the time two Jews were killed in the ghetto. No evidence, beyond his assignment, indicated that he in fact served with, or commanded, the ghetto guard. No evidence demonstrated that Stelmokas engaged in the conduct or duties the district court attributed to ghetto guards generally. F.F. 49-60.

2.

Alternatively, even if there was sufficient evidence to show that Stelmokas served with the ghetto guard, the district court failed to heed the teaching of Fedorenko v. United States, 449 U.S. 490, 512 n. 34 (1981) ("The solution to the problem...lies, not in 'interpreting' the Act to include a voluntariness requirement that the statute itself does not impose, but in focusing on whether the particular conduct can be considered assisting the persecution of civilians. Thus, an individual who did no more than cut the hair of female inmates before they were executed cannot be found to have assisted in the persecution of civilians."). The cases that interpret Fedorenko in the context of Nazi occupations, for the most part, emphasize the distinction between active and passive collaboration with the Nazis. Of necessity, each case is fact specific and turns on the particular evidence in the case. In United States v. Koreh, 59 F.3d 431 (3d

Cir. 1995), for example, we concluded that the defendant who had served as editor of pro-Nazi newspapers containing many anti-Semitic articles assisted in the persecution of Hungarian Jews through his activities. In United States v. Sprogis, 763 F.2d 115 (2d Cir. 1985), a case dealing with military or constabulary activity under Nazi direction, with facts more onerous than those in the case at bar, affirmed the denial of the denaturalization complaint brought by OSI.

The court in Sprogis emphasized the difference between active participation in hostile acts against civilians and passive accommodation of the Nazis. The defendant Sprogis admittedly served as a member of the local Latvian police, sometimes used by Nazis "to locate, arrest, guard, transport or execute Jews, and to confiscate their property." Id. at 117. Sprogis testified that he voluntarily joined the police force. Sprogis was Assistant Precinct Chief and eventually Police Chief. Id. at 118. Sprogis conceded he signed and prepared certain documents admitted into evidence demonstrating that he paid farmers to transport Jews to camps for confinement and persecution, of which he was aware. Id. He testified he was "the highest ranking officer" present at a police station where nine Jews were "forcibly detained." He conceded, and later contradicted his concession, that he "ordered other policemen to guard the prisoners." Id. at 119. Sprogis was in Litene on the day 200 Jews were executed en masse and contended he was there at the insistence of the district police chief and "only to witness, on behalf of the police," the execution of a photographer. Sprogis testified that as he was leaving Litene he saw 100 to 150 prisoners marching toward the camp where the photographer had been executed. Testimony by other witnesses indicated that "Sprogis, at the direction of the Nazis, ordered the arrest of all Jews in the area. . . . that the [police force of which he was a part], including Sprogis, participated in transporting and guarding approximately 200 Jews just prior to their execution . . . ." Id. at 120.

As in the case at bar, in Sprogis the government sought denaturalization under 8 U.S.C. §§ 1451(a) and 1427, with allegations grounded in § 10 of the Displaced Persons Act ("DPA"). The government claimed Sprogis' citizenship was "illegally procured" because he failed to disclose in his immigration papers that he assisted in persecuting Soviet prisoners of war, Jews and other civilians while a Latvian police officer. The government also asserted that his citizenship was procured through misrepresentations concerning his participation in persecution.

Confronted with such evidence, the court affirmed the district court's conclusion and stated:

> to prevail under any of its theories, the government had to show that Sprogis assisted in the persecution of Jews or other civilians and that the government had not satisfied its substantial burden of proving that assistance by 'clear, unequivocal, and convincing' evidence which does 'not leave the issue in doubt.'

Sprogis, 763 F.2d at 120 (citing Fedorenko v. United States, 449 U.S. 490, 505 (1981), and quoting Schneiderman v. United States, 320 U.S. 118, 125 (1943)). The court reiterated the district court's finding of "no credible evidence that Sprogis personally arrested or ordered the arrest of a Jew or walked the streets . . . with the demeanor of a uniformed or armed conqueror . . . he performed the duties of an ordinary police officer." Sprogis, 763 F.2d at 120-21. The court stated:

> Finally, he was present at the police station during the detention of the prisoners and he allowed their incarceration to continue. However, these were not acts of oppression. They do not amount to the kind of active assistance in persecution which the DPA condemns.

Id. at 122, (citing Laipenieks v. I.N.S. 750 F.2d 1427, 1432 (9th Cir. 1985) (assistance in persecution under 8 U.S.C. § 1251(a)(19), a companion statute to the DPA, requires "proof of personal active assistance or participation in persecutorial acts")).

The court of appeals further noted that in each of even the less-than-clear cases of assistance in persecution, "the individual condemned as a persecutor had actively participated in some act of oppression directed against persecuted civilians." Id. at 122. The court went on to acknowledge Sprogis' passive accommodation of the Nazis, but stated,

> There is no clear evidence that he made any decision to single out any person for arrest and persecution or that he committed any hostile act against any persecuted civilian. Sprogis' passive accommodation of the Nazis, like that of so many other civil servants similarly faced with the Nazis' conquest of their homelands and the horrors of World War II, does not, in our view, exclude him from citizenship under the DPA.

Id.

The district court's conclusion that the government established by clear, unequivocal, and convincing evidence that defendant was commander of the ghetto guard during the relevant period and thereby responsible for enforcing confinement of Jews is based only upon the fact that he was "assigned" as "Guard Commander in Vilijampole." Even if such a conclusion were supported by the evidence, and I do not believe it was, it would be insufficient grounds on which to denaturalize a citizen under the reasoning of Sprogis. Accordingly, the evidence regarding Stelmokas' conduct on September 17, 1942 was not sufficient to sustain the district court's conclusion in Count I.

### B. October 28, 1941

During the Grosse Aktion of October 28-29, 1941, more than 9,000 Jews were massacred in Kaunas, Lithuania. The OSI contends that Stelmokas participated in this slaughter, again on the basis

of very limited direct evidence.  The only direct evidence is that two witnesses stated in 1994, drawing upon their childhood memories 54 years past when they were 12 and 14 years of age, that they recall seeing men in Lithuanian army uniforms participating in the massacre.  The record indicates that these Lithuanian soldiers could have been members of either the Sonderkommando company or the 3rd Battalion.  No evidence confirms that these Lithuanian soldiers were members of the 3rd Battalion, of which Stelmokas was a member, or that he participated in any massacre.  Yet because a large number of Jews was involved, Dr. Raul Hilberg, the OSI's expert witness, concluded that the Nazis must have needed help to do their killing and that Stelmokas must have participated in the massacre.  In so doing, Dr. Hilberg pieces together a rather tenuous inferential chain:

Facts: Thousands of Jews were slaughtered in the ghetto on October 28, 1941; two eye-witnesses testified 54 years later that soldiers wearing Lithuanian uniforms participated.  Such soldiers could have been members of the Sonderkommando or the Schutzmannschaft.

First Inference: Because many Jews were killed on that date, the Nazi occupiers must have had insufficient numbers to conduct the operation themselves.

Second Inference: Being unable to conduct the operation themselves, the Nazis must have ordered Lithuanian uniformed soldiers to assist.

Third Inference: Because the Nazis had to enlist such help, and because two eye-witnesses testified that they saw men in Lithuanian uniforms, the 3rd Battalion must have been one of the two Lithuanian army units commanded by the Nazis to assist. This is either a non sequitur or an invalid disjunctive syllogism.

Fourth Inference: Because the Nazis had to enlist the 3rd Battalion, all battalion officers must have participated.

Fifth Inference: Assuming that the 3rd Battalion was the group ordered by the Nazis to assist (Inference Three), and that officers in that battalion participated (Inference Four), then Stelmokas, as an officer, must have participated.

The ultimate inference urged by the OSI is that Stelmokas participated in the Grosse Aktion.  For an inference to be legitimate, as set forth in note 3 ante, the reasoning upon which it rests must pass from some evidentiary fact (the datum) to a conclusion related in some way to that evidentiary fact and accepted only because that fact has been established.  Here, however, the conclusion (Stelmokas participated) is not directly related to the datum (many Jews were killed by soldiers and some soldiers wore Lithuanian army uniforms).  Instead, the conclusion requires that one meander through four other inferences to reach the datum.  One cannot make this stretch in the law, piling inference on inference on inference, and still meet the high burden of "clear, unequivocal, and convincing evidence which does not leave the issue in doubt."

That men in Lithuanian uniforms were allegedly present simply cannot support the bold conclusion that these men must have been members of the 3rd Battalion, let alone that one of

these men must have been Stelmokas.  The men in Lithuanian
uniforms very well could have been members of the Sonderkommando
company.  A comparable chain of quintuple inferences such as that
relied upon by the government and district court in this case,
could not, as a matter of law, support a charge of shoplifting,
let alone bolster the revocation of a petitioner's citizenship--a
punishment tantamount to exile or banishment.  Accordingly, I
agree with Judge Stapleton and I accept his analysis in the
concurring opinion that the government did not meet its high
burden of proof that Appellant participated in the Grosse Aktion
of October 28-29, 1941.

For the reasons presented above, I would reverse the court's
determination on Count I.

                              III.

In Count II the government alleges that Stelmokas was
ineligible for a visa because he voluntarily assisted the enemy
forces in their operations against the United Nations.  The heart
of this contention is that a finding of mere service in the 3rd Battalion
(Schutzmannschaft) and in the 91st Light Flak
Replacement Unit of the German Army was sufficient to meet the
government's high burden of proof required for
denaturalization.  I find this argument unpersuasive for two
reasons.

First, the government relies on part II of the International
Relief Organization (IRO) Constitution, incorporated into the
Displaced Persons Act.  That provision precludes certain people
from being considered for naturalization as follows.

Persons who will not be the concern of the organization:

2. Any person who can be shown:

. . . .

(b) to have voluntarily assisted the enemy forces since the
outbreak of the second world war in their operations against
the United Nations.

D.P.A. § 2(b), Pub. L. 80-774, ch. 647, 62 Stat. at 1009
(incorporating IRO Constitution, Annex I, Part II).  An
explanatory regulation later adopted by the Displaced Persons
Commission (DPC) interprets "operations against the United
Nations" as follows:

[Anyone who] has voluntarily borne arms in armed forces or
auxiliary organizations against the United States or its
Allies on the Western Front (including North Africa and
Italy) during that period of World War II beginning December
8, 1941; a person shall not be deemed so to have served
voluntarily if he establishes that he was compelled against
his will to serve in the armed forces or auxiliary
organizations, against the United States or its Allies on
the Western Front.

8 C.F.R. § 702.8(f) (my emphasis).  The 3rd Battalion served in
the occupied Baltic countries, not on the Western Front, and the

complained of activities took place before December 7, 1941. Therefore, Stelmokas does not appear to be in that category of persons who assisted the enemy in military operations against the United States or its Allies in the Western Front.

> Moreover, commentary to the IRO Constitution provides:
> Mere continuance of normal and peaceful duties, not performed with the specific purpose of aiding the enemy against the Allies or against the civil population of territory in enemy occupation, shall not be considered to constitute "voluntary assistance."

IRO Constitution, Annex I, Part II, 62 Stat. 3037, 3052.

At trial, direct testimony was adduced that normal 3rd Battalion duties included guarding stationary installations such as bridges, warehouses, government buildings, peatbogs, ammunition depots and communications facilities. A283-284. Official interpretations of Section 2(b) of the IRO Constitution, especially those limiting improper activities to those performed on the Western Front, required the OSI to produce more evidence than mere membership in a military or constabulary unit to support its contention in Count II. See also the discussion in Part IV, post, exempting from "movement which is or has been hostile to the United States" service in military forces or local constabularies. Under these circumstances I would hold that the government failed to produce sufficient evidence to sustain Count II.

IV.

In Count III the government charges that Stelmokas participated in a movement hostile to the United States. The district court concluded that mere participation in the 3rd Battalion was sufficient to warrant denaturalization and that the government met its burden by demonstrating that Stelmokas volunteered to serve in the 3rd Battalion, a LithuanianSchutzmannschaft, an organization on the U.S. government's Inimical List. On this issue, I find unavailing both the government's argument and the district court's conclusion.

Although the government placed an Inimical List in evidence, A1644, it presented no evidence that mere membership in any organization on the List was sufficient to deny an applicant a visa. Indeed, in addressing "the materiality issue or rejections under the inimical list," OSI trial counsel represented to the district court that it was necessary to present "the testimony of someone who was--who operated or applied it . . . ." A723. The district court made clear that explanatory testimony was mandatory: "It seems to me, with the list and with someone explaining how the list was utilized at the time of Mr. Stelmokas' application, yes, the answer is, it might [be relevant]." Id. This exchange clearly demonstrated the need for official explanation of how the List would have applied to persons seeking displaced-persons status.

Yet no such explanatory testimony was forthcoming. The only evidence introduced was an Inimical List in the nude. Although Appellant's counsel stipulated that it was an Inimical List and

in effect at the relevant times, he did not stipulate that the DPC or the Consular Service would deny visas on the basis of mere membership in an organization on the List.  More important, the record is totally barren of testimony from any witness that membership in the Schutzmannschaft, in and of itself, would have been sufficient to deny displaced-person status in 1949.

Further, the federal regulation which governs § 13 of the Displaced Persons Act limits the disqualification of applicants for displaced-persons status to any person who:

> (d) Is or has been a member of or participated in any movement which is or has been hostile to the United States or the form of government of the United States; such a movement includes but is not limited to the communist, Nazi or Fascist parties or political or subversive groups of an ideological character similar to that of the aforementioned parties; . . . .

8 C.F.R. §702.8(d) (my emphasis).  By cable dated April 20, 1949, Secretary of State Dean Acheson interpreted "movement" in § 13 of the Act not to include military forces or local constabularies.  Appellant's Br., Exhibit A.  Significantly, at the time Stelmokas made his application in July, 1949, the Secretary of State's directive was in full force and effect.  Given that the 3rd Battalion operated very much as the local constabulary, Stelmokas' membership in that organization should not for purposes of § 13 be construed as membership in a "movement" hostile to the United States and its allies.

The government failed to produce testimony describing how the List was used.  There is not a smidgeon of evidence to indicate that mere membership in an organization named on the Inimical List was a sufficient basis on which to deny Stelmokas' visa application.  Moreover, Secretary Acheson's interpretation of "movement" indicates that Stelmokas' membership in the 3rd Battalion, a military force or constabulary, was not sufficient to trigger disqualification for displaced-persons status under the Displaced Persons Act.  Accordingly, the government has failed to meet its high burden of proving that Stelmokas, by mere membership in a local military or constabulary organization, voluntarily participated in a movement hostile to the United States.  I would therefore reverse the court's conclusion on Count III.

V.

At the time of Stelmokas' immigration in July, 1949, U.S. State Department regulations prohibited issuing visas to any alien "who has advocated or acquiesced in activities or conduct contrary to civilization and human decency on behalf of the Axis countries."  22 C.F.R. § 53.33(j).  In Count V the government alleges that under this regulation Stelmokas was ineligible for a visa.  The government contends that he was ineligible first, because he failed to leave the 3rd Battalion and second, because he persecuted civilians on September 16-17 and October 28-29, 1941.  I will address these arguments in turn.

The district court determined that Stelmokas' "failure to

leave the Schutzmannschaft or to act on behalf of the Jews constituted acquiescence in conduct contrary to civilization." The court thus concluded that the government had met its burden on Count V. Dist. Ct. Op. at 55-56. The court erred. More than mere membership in the Schutzmannschaft is necessary to prove conduct contrary to civilization and human decency. Indeed, the Supreme Court teaches that mere membership is not enough and that there must be proof of actual participation in such conduct. The Court "focusing on whether particular conduct can be considered assisting in the persecution of civilians." Fedorenko v. United States, 449 U.S. 490, 512-513 n.34 (1981). Although it is undisputed that Stelmokas was a member of the 3rd Battalion, the record provides no evidence that he participated in conduct that amounted to persecution of civilians. It is conduct in an organization, not mere membership, that determines culpability.

The government contends in Count V that Stelmokas acquiesced in conduct contrary to human decency by participating in the persecution of Jews on September 16-17 and October 28-29, 1941. As I have indicated in my discussion in Part II, the government did not meet its high burden of proving that Stelmokas actually participated in persecuting Jews on these dates. Professor Hilberg's testimony is significant in this respect: "I did not see in any of the sequence of documents . . . anything that would indicate [sic (implicate?)] Stelmokas directly in the arrest, killing of Jews, but he is in the company in which these things are going on." A626. Passive accommodation of the Nazis, as distinguished from personal, active assistance in persecution, does not constitute conduct contrary to civilization and human decency. Fedorenko, 449 U.S. at 512-513 n.34. See also United States v. Sprogis, 763 F.2d 115, 122-123 (2d Cir. 1985); Ofsua v. McElroy, 933 F. Supp. 237, 243-244 (S.D. N.Y. 1995.)

The government has not demonstrated that Stelmokas' mere membership in the 3rd Battalion constituted advocacy of, or acquiescence in, conduct contrary to civilization. Moreover, the record is devoid of any competent or persuasive evidence that Stelmokas played a role in the persecution of Jews in September and October, 1941. Thus, on Count V the government has failed to meet the high burden of proof required for denaturalization. Accordingly, I would reverse the district court's determination on this issue.

## VI.

In Count VI the government charges Stelmokas with illegally procuring his citizenship because his membership in the 3rd Battalion and his participation in the persecutions of September and October, 1941 showed a lack of good character. The district court found in favor of the government on the basis of Stelmokas' voluntary enlistment in the Schutzmannschaft and direct assistance and participation in the persecution of Jews in Lithuania. The court concluded that these factors establish a lack of good moral character. Dist. Ct. Op. at 56-57.

As I previously set forth in Part II, the government failed to prove that Stelmokas was voluntarily and directly involved in the persecution of Jews in September and October 1941. Moreover, this court recently affirmed a district court's conclusion that

determination of a person's moral character must rely on
something more than superficial evidence of a person's status or
title:

> [T]he very essence of meaningfully determining a person's
> moral character is not simply to look at their status or
> title . . . but to examine the actor's conduct and the
> circumstances surrounding it.  We refuse to revoke
> citizenship by finding that a person prima facie lacks good
> moral character simply because he held the title of
> concentration camp guard without some further showing that
> the person engaged in some morally reprehensible conduct and
> did so voluntarily.

United States v. Schiffer, 831 F. Supp. 1166, 1199 (E.D. Pa.
1993), aff'd 31 F.3d 1175 (3d Cir. 1994.)  Absent evidence of any
illegal conduct and based on nothing more than Stelmokas' mere
membership in the 3rd Battalion, the government could not prove
and the district court improperly concluded that he lacked the
good moral character required for citizenship.  Accordingly, the
court erred in granting judgment to the government on Count V.

                              VII.
     In Count IV the government alleges that Stelmokas' order and
certificate of naturalization should be revoked

>     on the ground that such order and certificate of
>     naturalization were illegally procured or were procured by
>     concealment of a material fact or by willful
>     misrepresentation.

8 U.S.C. § 1451 (a).  In its complaint the government contended
"that in failing to list his wartime residences and occupation,
Stelmokas made a willful and material misrepresentation when
applying for Displaced Person status as defined in § 10 of the
Displaced Persons Act."  Compl. ¶¶ 57-58, 62.  The contention was
an attempt to prevail on the "procured by" clause of § 1451(a),
but the district court found against the government on that
claim.  See note 1, ante.  The court found in favor of the
government's claim brought under the "illegally procured" clause,
concluding that:

>     Defendant's misrepresentations and concealments to the DPC
>     and the U.S. vice-consul were material because they
>     concealed the fact that defendant had assisted the enemy in
>     the persecution of civilians, had voluntarily assisted the
>     military operations of the Axis powers, and had been a
>     member of a movement hostile to the United States and
>     its form of government.

Conc. Law 32.

     From this the court concluded that Stelmokas was ineligible
to immigrate pursuant § 10 of the DPA; that such ineligibility
rendered his entry unlawful; and because his entry was unlawful,
"his naturalization as a United States citizen on April 11, 1955
was illegally procured."  Conc. Law 33.
     The government's reliance on the "illegally procured" clause

must not be evaluated in a vacuum.  The district court's ultimate determination is the conclusion of a polysyllogism with many premises omitted.  The polysyllogism begins with a major premise stating that §10 of the DPA barred from immigration any person who willfully misrepresented material facts in order to gain entry as a displaced person.  The argument next contends that Stelmokas made misprepresentations and because the misrepresentations were material, he was ineligible for entry; therefore, Stelmokas' actual entry was unlawful and his naturalization "illegally procured."  The critical inquiry is whether the government met its important threshold burden of proving a misrepresentation as defined in the Displaced Persons Act.

### A.

Our starting point is the statute:

Any person who shall willfully make a misrepresentation for the purpose of gaining admission into the United States as an eligible displaced person shall thereafter not be admissible into the United States.

D.P.A. § 10, Pub. L. No. 80-774, ch. 647, 62 Stat. 1009 (1948).  When Stelmokas applied for citizenship in 1949, eligibility investigations and reports were made only by the Displaced Persons Commission (DPC).  The Commission defined misrepresentation for the purpose of § 10 of the Act:

Misrepresentation.  "Misrepresentation for the purpose of gaining admission into the United States" refers to a willful misrepresentation, oral or written, to any person while he is charged with the enforcement or administration of any part of the Displaced Persons Act, of any matter material to an alien's eligibility for any of the benefits of the said Act.

8 C.F.R. § 700.11.  It is not disputed that Stelmokas misrepresented his wartime residences and occupation.  Thus, the first inquiry is whether those misrepresentations met the legal standard of materiality.

The Supreme Court established the current test in Kungys v. United States:

[A] concealment or misrepresentation is material if it `has a natural tendency to influence or was capable of influencing, the decision of' the decision making body to which it was addressed . . . We hold, therefore, that the test of whether Kungys' concealments or misrepresentations were material is whether they had a natural tendency to influence the decisions of the Immigration and Naturalization Service.

485 U.S. 759, 770-772 (1988)(citing, inter alia, Weinstock v. United States, 231 F.2d 699, 701-02 (D.C. Cir. 1956).  I concede that Stelmokas' failure to disclose his wartime military status would have had a natural tendency to influence immigration decisions.  However, as the Court made clear in Kungys and United States v. Gaudin,___ U.S. ___, 115 S.Ct. 2310, 2319 (1995), materiality is a mixed question of law and fact.  As in all mixed

questions, the definition of the legal component must come first, followed by a presentation of facts against which the legal component must be measured.

In denaturalization cases, equally important to establishing a material statement is the presentation of evidence that the misrepresentation procured the order and certificate of naturalization. See Gaudin, 115 S.Ct. at 2314. This is the factual component of the mixed question. Establishing at least a modicum of evidence on the procurement element is essential to the government's burden of proof.

In Kungys, a prototype of OSI prosecution, the defendant twice misrepresented his date and place of birth: once in 1947, when applying for a visa, and again in 1954, when petitioning for naturalization. The Court approved dismissal of the government's complaint against Kungys because misrepresentations about his place of birth, wartime occupations and residence were not shown to be unequivocally material. In addition to being required to demonstrate materiality as a matter of law, i.e., that a material statement was made, the government was obligated to demonstrate that Kungys' citizenship status was procured by his material misrepresentations. The Government seems to ask this court to apply different meanings to the term "procured" in the two clauses of § 1451(a).

The government suggests that it has different ultimate burdens depending on whether "procured" applies to naturalizations that are "illegally procured" or to those "procured by concealment of a material fact or by willful misrepresentation." There is no rational support for the suggestion that Congress intended such an anomalistic reading of the same word in the same section of the same statute. There is absolutely no rational support for the notion that the government is not required to produce evidence showing precisely how Stelmokas was "unlawfully admitted" and whether his naturalization was in fact "illegally procured." If under the second clause in § 1451 the government must show that the naturalization was "procured by" the alleged misrepresentation, as the Court held in Kungys, then under the first clause certainly the government must demonstrate that Stelmokas was ineligible and therefore unlawfully admitted.

The traditional procedure by which the government has shown ineligibility, used in every case it has brought excepting this one, is to proffer testimony that the applicant's naturalization, or Displaced Persons status, resulted from the alleged misrepresentations. Even if we do not require the government to prove the visa or naturalization certificate would not have been granted but for the misrepresentations, until today courts have not permitted the government to proceed without any evidence whatsoever on the question of whether the misrepresentations procured the applicant's citizenship.

Indeed, the combined opinions of Justices Scalia and Brennan in Kungys, and Justice Scalia's opinion for a unanimous court in Gaudin, indicate that the government must establish by factual evidence how immigration officials interpreted and administered the immigration law during the period in question. The

government must show not only that the misrepresentation would have a "natural tendency to influence" the DPC analyst's decision, but also that the misrepresentation did in fact influence that decision. Thus, Justice Scalia's opinion for the Kungys Court points out that § 1451(a) of the denaturalization statute contains four independent requirements:

> the naturalized citizen must have [1] misrepresented or concealed some fact, [2] the misrepresentation or concealment must have been willful, [3] the fact must have been material, and [4] the naturalized citizen must have procured citizenship as a result of misrepresentation and concealment.

485 U.S. at 767 (my emphasis).

The requirements above must similarly be established in this case to prove the § 10 Displaced Persons Act allegations made by the government. The repeated use of the word "procured" in both grounds for revoking naturalization under § 1451 makes clear Congress' intent to impose on the government the fourth requirement--that some nexus be established between the misrepresentation or unlawful conduct and the applicant's receipt of the naturalization certificate--regardless of the clause under which the government files suit.

I have acknowledged that the first three of the Kungysrequirements were met here. In view of the Court's definition of materiality, Stelmokas' misrepresentations were material to the extent that they had "a natural tendency to influence the decisions." Id. at 768. The critical lack of proof in this case lies with the fourth requirement--that the misrepresentations did, in fact, result in ineligibility. Without this critical factual base, the argument may not properly proceed to subsequent prosyllogisms and episyllogisms culminating in "unlawfully admitted" and "illegally procured."

The fourth requirement was not controverted in Kungysbecause the government produced the testimony of Ambassador Seymour Maxwell Finger, a former vice-consul at Stuttgart, Germany, who described how immigration officials had interpreted and administered the immigration law during the period in question. See United States v. Kungys, 793 F.2d 516, 530-31 (3d Cir. 1986). Justice Brennan, who furnished the fifth vote for the majority in Kungys, emphasized in his concurring opinion that such testimony was essential. 485 U.S. at 783. Thus, the precise holding in Kungys was that only after presentation of a prima facie factual case and a demonstration of materiality was the government entitled to a presumption that the applicant was ineligible for citizenship. Justice Brennan's concurrence eloquently articulates his concern that the "precious right" of citizenship not be revoked unless the government has met its full evidentiary burden:

> I agree with this construction of the statute. I wish to emphasize, however, that in my view a presumption of ineligibility does not arise unless the Government produces evidence sufficient to raise a fair inference that a statutory disqualifying fact actually

existed.  It is this fair inference of ineligibility,
coupled with the fact that the citizen's
misrepresentation necessarily frustrated the
Government's investigative efforts, that in my mind
justifies the burden-shifting presumption the Court
employs.  Evidence that simply raises the possibility
that a disqualifying fact might have existed does not
entitle the Government to the benefit of a presumption
that the citizen was ineligible, for as we have
repeatedly emphasized, citizenship is a most precious
right, . . . and as such should never be forfeited on
the basis of mere speculation or suspicion.

Id. at 783 (citation omitted).

Fatal to the OSI's argument in the case before us is the
government's failure, in Justice Brennan's words, to "produce
evidence sufficient to raise a fair inference of ineligibility."
Id.  The absence of factual evidentiary support regarding
ineligibility based on Stelmokas' statements renders wholly
speculative the conclusion that such misrepresentations led to an
unlawful admission to the United States and ultimately illegally
procured his naturalization.

I find no inconsistency between the teachings in the
opinions of the Court in Kungys and Gaudin, both authored by
Justice Scalia.  In Kungys, a denaturalization case involving the
second "procured by" clause of § 1451, the Court required
presentation of factual evidence that "the naturalized citizen
must have procured citizenship as a result of misrepresentation
or concealment." 485 U.S. at 767.  It follows inexorably that
when relying on the "illegally procured" clause, the government
must also present evidence demonstrating that the admittee was
ineligible for admission.  In Gaudin the Court stressed the
necessity of developing the factual basis of "materiality" and
emphasized that materiality is "a mixed question of law and fact
[in which a characterization] for one purpose does not govern its
characterization for all purposes."  115 S.Ct. at 2319.
Similarly, the Court in Kungys stressed the importance of
presenting facts on the issue of illegal procurement of
citizenship by referring to the testimony of Ambassador Finger on
how immigration officials interpreted and administered
immigration law during that period.  Making reference to this in
Gaudin, Justice Scalia described Kungys as an example where "the
appellate court's newly asserted standard of materiality could be
applied to the facts [of materiality] by the appellate court
itself, instead of requiring remand to the District Court for
that application."  Id. at 722; 115 S.Ct. at 2314.

In every successful OSI prosecution that I have researched,
the government raised this fair inference by presenting evidence
in two discrete respects: (1) evidence detailing wartime
activities of the defendant; and (2) testimony from appropriate
U.S. officials that had these activities been known to the
Displaced Persons Commission analysts, the defendant's
application would have been denied or subjected to additional
investigation.  Indeed, every OSI prosecution that I researched

contained testimony by officers of the Displaced Persons Commission, consular officers or both describing the effect that a particular misrepresentation would have had on the analysts examining the application. This essential testimony sets forth whether the authorities would have granted, denied, or referred the application for further investigation, and it sets forth a prima facie case on whether the applicant's alleged misrepresentations procured the visa and naturalization decisions made by the officers.

In the leading Supreme Court cases that inform our denaturalization jurisprudence, the OSI presented witnesses who testified that the visa would not have been issued had the true facts been known. In Fedorenko, vice consul Kempton Jenkins testified that the petitioner's service as an armed guard made him ineligible for a visa. Fedorenko, 449 U.S. at 498-99. As discussed above, in Kungys, Ambassador Finger described how immigration officials interpreted and administered the immigration law during the relevant period. Kungys, 793 F.2d at 530-531. Clearly the Supreme Court has underscored the necessity for "testimony about how the Act was interpreted by the officials who administered it." Fedorenko, 449 U.S. at 511.

In short, in every prosecution brought by the OSI that I researched, including the Supreme Court decisions central to our jurisprudence in denaturalization matters, the OSI presented evidence not only that the alleged misrepresentations had a natural tendency to influence, but also that they did in fact so influence the visa decision--i.e., that the visa was procured by the applicant's misrepresentations. Such evidence was starkly absent in the present matter and this absence is fatal to the OSI's argument that Stelmokas' naturalization was "unlawfully procured."

My personal research may be faulted. Therefore, at oral argument I asked counsel for the OSI to examine the records of his office to determine whether any other OSI prosecutions have been presented without testimony by a representative of the Displaced Person Commission, the International Relief Organization or the consular service as to the effect of the misrepresentation on the applicant's procurement of citizenship. Counsel responded, "I will send you a letter one way or another, Judge Aldisert." Although the government's counsel filed a supplemental brief following oral argument, the brief did not supply the information requested by the court. Thus, I will draw the appropriate inference.

B.

I have conceded that Stelmokas' misrepresentation of wartime activities would have had the "natural tendency to influence the decision" of DPC officials. Therefore, the government met its burden of setting forth the legal component of the mixed materiality question. However, the government has not met its high burden of proof in this case because it failed to produce evidence that Stelmokas' misrepresentations procured the decision of the DPC analyst and the naturalization officials. The government failed to produce any prima facie evidence that the visa and naturalization decisions were procured by the alleged

unlawful conduct.

Although no such evidence was presented to the district court, the court nonetheless concluded:

33. Defendant was ineligible to immigrate to the United States pursuant to DPA § 10. His entry to the United States for permanent residence in 1949 was therefore unlawful and his naturalization as a United States citizen on April 11, 1995 was illegally procured.

Dist. Ct. Op. at 54–55. Here the court conflated a question of law with a question of fact. It decided, and properly so, that the misrepresentation had a natural tendency to influence the decision making. This was the question of law. It then decided, as a matter of fact, that the misrepresentation did in fact influence and procure the government's visa decision and, therefore, subsequently procured unlawful naturalization. The court erred here because the record was barren of any testimony regarding what factors procured his visa, let alone which types of misrepresentations would have made Stelmokas ineligible for entry at the time he applied. That the procurement element in § 1451 is a question of fact is set forth in Kungys in both the opinion of the Court and the concurring opinion of Justice Brennan; it is also established in Gaudin and reflected in OSI's universal practice of presenting testimony by officials as to the immigration policy of the United States at the relevant time.

By way of analogy, a trial judge in a murder case would hear the prosecution's evidence that, as a matter of law, a bullet fired from a defendant's Colt .45 had the natural tendency to cause death. However, the prosecution still would have to prove that, as a matter of fact, a .45 bullet was a factor in the decedent's death. Likewise, as an experienced judge reviewing matters having to do with State Department or immigration policy, I can decide as a matter of law the legal component of a mixed question of law and fact. But it is absolutely necessary that, before I may properly perform that judicial function, some facts be developed against which the legal standard can be measured.

A fortiori, I confess ignorance as to the factual overlay of discretionary powers vested in immigration officials in the turbulent post-war years of the late 1940s. I suggest that my distinguished judicial colleagues on this court, on the district court and on the Supreme Court also lack this information. Such crucial factual information is not the stuff of which judicial notice is made; it is the stuff that must be presented as record evidence at a trial. Yet the district court determined as a matter of law, without even a prima facie showing regarding relevant United States immigration policy, that "Defendant was ineligible to immigrate to the United States pursuant to the DPA § 10." Dist. Ct. Op. at 54.

The OSI failed to present any evidence on this count. Therefore, the district court was left to speculate about whether the DPA analyst in 1949 would have referred to the Inimical List, how the analyst would have interpreted it, and whether the analyst would have decided to grant, deny, or further investigate Stelmokas' visa application based on that List. Because the OSI

failed to present any evidence, the court could only conjecture that the analyst would have thought conditions in occupied Lithuania justified a finding of ineligibility. Because the OSI failed to present any evidence, the court had to surmise that the analyst would have found the 3rd, 11th or 253rd Battalion of the Lithuanian National Labor Defense Battalions actively assisted the Nazis in the persecution of civilian populations.

In short, the government failed to present any testimony by witnesses to prove an actual, a probable, or even a possible impact on the analyst's eligibility decision in July, 1949. Therefore, we are left to hypothesize. Hypothesizing is no substitute for proof, especially where the burden is "substantially identical with that required in criminal cases-- proof beyond a reasonable doubt." Klapprott v. United States, 335 U.S. 601, 612 (1949). Therefore, the judgment of unlawful procurement on Count IV must be reversed.

## VIII.

This too must be said. In American jurisprudence there is no analogue to permitting a trial on events that occurred a half-century in the past. Indeed, with the exception of murder cases, all criminal and civil proceedings are rigorously circumscribed by fixed statutes of limitations. Such statutes preclude the institution of criminal or civil complaints after a finite number of years. Similarly, in equity petitions, stale actions are barred by the doctrine of laches.

The policy that undergirds our statutory and judicial limitations on such actions is rooted in an understanding that with the passage of time, witnesses disappear and memories fade. Such a policy reflects appreciation for the reality that, because our memories are fragile and inevitably compromised by the ravages of time, at some point they can no longer be considered trustworthy for presentation under oath as "the truth, the whole truth and nothing but the truth." It may well be that a half century after a Displaced Persons Commission's analyst examined the visa application of Jonas Stelmokas, witnesses are either no longer available or incapable of testifying as to the immigration practices of the United States in 1949. This is the price that the government must pay for bringing any case so long after these events took place.

Given contemporary concepts of due process, it is doubtful that one could be tried in 1996 for a murder that took place in 1941. Nevertheless, the judiciary continues to permit the prosecution of stale denaturalization cases like this one. Perhaps this is because such cases embody a fundamental tension between two venerated precepts of the American legal tradition. One precept dictates that those responsible for the Holocaust be punished: that they be sought out in America and either extradited to Israel or denaturalized, deported and ultimately punished by the sovereignty where the despicable acts took place. The other precept demands full compliance with the letter and spirit of the American judicial process; it demands that a prosecution be held to every aspect of its burden of proof, particularly in so important a matter as a denaturalization

proceeding.  Because such cherished values are at stake, decision by judicial fiat must never replace decision-making based on the presentation of evidence.  Thus, when we come to the intersection of such esteemed precepts, we must be especially vigilant to protect the procedures that lie at the heart of our judicial process, lest in our zeal to avenge the victims of the Holocaust, we unwittingly permit our judicial traditions to be victimized.

Those of us who sacrificed years of our youth in World War II to combat the forces of tyranny are understandably sensitive to these issues.  We are sensitive to the danger that fundamental values of our glorious American tradition, including the protections guaranteed by our legal system which we fought to preserve, might be compromised in a fervor to punish one who may have aided the bestiality of our common enemy.  We are especially sensitive when that effort to punish is initiated more than half a century after the last shot in anger was fired.  Certainly those who violate the rules of society must be punished, but society itself must never breach its own rules to achieve that end.

To continue the prosecution of octogenarians (and soon nonagenarians) is, to be sure, a political decision.  Such decisions are properly left to the exclusive discretion of our executive branch.  Nevertheless, if these prosecutions have not already pushed the envelope beyond traditional notions of due process, soon they will do just that.  There is no precedent in our tradition that permits a prosecution on events that occurred so far in the past.  Although I have grave doubts about the constitutionality of so stale a prosecution, I do not meet the due process issue here because I would grant relief on other grounds.

For all the foregoing reasons, I dissent.  I would reverse the judgment of the district court ordering denaturalization.